**Freddie ROBINSON, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 16826.**

United States Court of Appeals District of Columbia Circuit.

Argued June 4, 1962.

Decided Aug. 30, 1962.

Mr. Charles H. Mayer, Washington, D. C. (appointed by this court), for appellant.

Mr. Daniel A. Rezneck, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Nathan J. Paulson and Victor W. Caputy, Asst. U. S. Attys., were on the brief, for appellee.

Before WILBUR K. MILLER, Chief Judge, and DANAHER and WRIGHT, Circuit Judges.

DANAHER, Circuit Judge.

A jury found appellant guilty of second degree murder. Appellant and one Berlene Waters had been inaicted in three counts, the first two of which, charging robbery and felony murder respectively, had been dismissed at the close of the Government's case. Appellant argues first that the court erred in failing to grant his motion for acquittal on the third count. He also alleges error in various rulings to which we will later advert.

█ The evidence discloses that in the early morning of April 9, 1961, appellant and the Waters woman were in "an after-hours spot" conducted by one Diggs. Diggs had known the appellant "since he was a kid." He saw "Freddie" toss a 25 caliber automatic across a table. He testified that "Berlene picked the gun up and placed her hand on the trigger. I replied to them both that in a crowded house like this, it was awful stupid for them to pitch a gun across my table and Berlene, I told her to take her hand off the trigger." On cross examination he testified to having said "lady take your hand off that trigger because that type of pistol will go off just looking at it." About fifteen minutes later, Diggs saw the appellant and the Waters woman leave his place.

About a block and a half away is an alley located in the 800 block of Eye Street, S. E. There, at about 1:15 A. M., one Marie Witcher heard a shot. She looked from her window and saw a body in the alley. She called police.

One Hollis Hudson at about the same hour heard a commotion in the alley behind his house. He heard more than two people talking but could not say whether the voices were male or female. He heard someone say "you got your G.D. gun, go ahead and shoot." Presently he heard a shot.

One Clarence Mitchell testified that he had known Berlene Waters for a number of years. When he heard the shot he came out of his house to investigate. He saw Berlene coming around the side of his house, "coming out of the alley," and he spoke to her. She was excited and made a reply which we will later discuss.

He also, about the same time, saw a tall, colored fellow come out of the alley and run past the house.[1]

Responding to Marie Witcher's telephone call, the police found the victim in the alley. He was taken to the hospital, where a few hours later he died. An autopsy was performed by Dr. Whelton who found that the victim's death was due to a gun shot wound in the head. He recovered a copper-jacketed slug from the right side of the victim's brain.[2]

Two days after the shooting, the police during the early morning hours of April 11, 1961, located Robinson, asleep at his mother's house. He was placed under arrest and brought to headquarters. Later that morning, at 10:15, he was presented before United States Commissioner Wertleb. The latter testified that he "fully" advised Robinson of the nature of the complaint, told him he was not required to make any statement "in regard to that complaint," and that any statement he made could be used against him. The Commissioner further informed Robinson of his right to retain counsel, to have a preliminary hearing, and to cross examine witnesses against him and to introduce evidence in his own behalf. The Commissioner issued a commitment, pursuant to which the marshal took custody of the accused.

Later, that same day, about 1 P.M., in the marshal's cellblock in this court house, the police appeared with Berlene Waters. In the presence of Robinson and of various officers as well as the deputy marshal, Berlene Waters stated that in the early morning of April 9th, she had been with Freddie Robinson at John Diggs' place. She said that Robinson had a gun with him which he allowed her to handle. After she left the after-hours establishment with Freddie, she saw the latter talking to a white man.

Robinson and the victim were ahead of her as they walked up an alley near 811 Eye Street. Freddie was looking back at her, and she walked to the alley also, thinking that Freddie "was going to take the man up there for a roll job." Shortly afterward, Freddie Robinson came toward her running out of the alley and told her that he had shot the man.

As Berlene Waters confronting Robinson told her story he several times interrupted to say that she did not know what she was talking about, or that she was lying. Robinson said that she was trying to put all the blame on him, but that she was as guilty as he. He thereupon said he would tell it the right way, "exactly how this thing happened."

Robinson's version, summarized, was that Berlene Waters had told Freddie she was "going to turn a trick" with the victim. Berlene asked him if he wanted to make some easy money. He said he followed Berlene and the white man into the alley where she told Freddie that they would "roll him." She told Freddie to pull the gun on the victim which he did, saying "Give me your money." Berlene Waters said "Don't ask him for it. Back him up against the house and take it." The man took a five dollar bill from his pocket and handed it to Freddie. The victim looked at the gun in Freddie's hand as though he doubted it was real. Freddie explained that he sought to eject a shell to let the man know it was a real gun, but the slide slipped out of his hand. The gun was discharged, the victim was wounded and fell to the ground. Then, Robinson and Berlene ran out of the alley, caught a cab and rode uptown.

After such oral admissions with the deputy marshal standing by,[3] a written statement was typed out. Robinson signed each of three pages. Despite the

[1]. Robinson testified he is 6 feet 5 inches tall.

[2]. It was stipulated by the defense "that the bullet that was exhibited in evidence was a 25 calibre," and further that "this is the same bullet that was removed from the decedent."

[3]. The deputy marshal assigned to the cellblock in this court house described the confrontation as lasting 10 to 15 minutes. The officers warned Robinson he need not talk. No promises or threats were made, no inducements were offered, and there was no violent treatment of Robinson.

rather complete details supplied in his formal signed confession which markedly corroborated the Berlene Waters' statement, Robinson, taking the stand in his own defense, insisted that he never had owned a gun and denied shooting the victim. On the other hand, he admitted that Berlene Waters had charged him directly with having taken the victim into the alley and that he had later come running out of the alley saying he had shot a man. He testified that "Berlene came in there and said her little piece. And right after she said it, she grabbed her hat and ran out, because I told her she was lying." He repudiated the confession: "It is no statement of mine."

Even as he insisted he had not confessed, on cross examination he corroborated in many important details, the testimony of various other witnesses. Although he sought to establish an alibi, he admitted he was in the Diggs establishment when Berlene came in. He saw a gun on the table, but did not know "where it fell from"—perhaps "from her bosom." Berlene had stopped at his table and asked for a drink. In these and other respects, the jury might well have concluded that he told the truth only when so to answer might prove advantageous to him.

Each of several officers testified to his admissions when confronted by Berlene Waters, quite apart from the running narrative found in the confession itself.

The trial judge instructed the jury:
"You are instructed that testimony as to what Berlene Waters said at that time is not evidence against Robinson, and is not [to]

be considered as such by the jury. You are further instructed that testimony as to what Robinson himself said is evidence against him and may be considered as such by the jury. While testimony as to what Berlene Waters said at the time mentioned is not of itself evidence against Robinson, nevertheless if what she said brought forth any statement by Robinson with reference thereto, then the jury may consider Berlene Water's [sic] statement in the cellblock, but only for the purpose of putting in its true setting any statement made by Robinson himself which the jury may find was brought forth by the statement of Berlene Waters."

Thereafter instructions, correct in law and adequate for the guidance of the jury, were given with respect to the confession itself. The jury returned a verdict of guilty of murder in the second degree against the appellant Robinson.[4] A careful study of the entire transcript impelled the conclusion that the jury's verdict was amply supported. There was no error in the denial of Robinson's motion for a directed verdict of acquittal.

## II

■ But appellant argues the trial judge erred in ruling that the prosecutor was entitled to claim "surprise" during his examination of the witness Mitchell. In effect, he contends that as a result of the ruling, Mitchell was permitted to Robinson's prejudice to examine his own signed statement given to the police the day Robinson was arrested, and then with his recollection refreshed, to testify more fully.

The deputy marshal saw Robinson sign the confession and appended his own signature.

The defense counsel asked: "Is it the usual function of the Deputy Marshal to be in the room while this questioning is going on?" "A. When we bring the prisoner from the back * * * [he] doesn't have to talk to anyone unless he wants to, we tell him that. If he doesn't want to talk to this person, we just leave

him back there [in the hold cell] and tell the people that want to see him that he doesn't want to talk to them. And the supervisor told me to stay with this man all the way through, stay in the [interview] room with him."

4. Berlene Waters during a pretrial examination at St. Elizabeths had been found incompetent to stand trial.

The defense claimed first that the prosecution was not entitled to assert surprise, for it was on notice that Mitchell at a coroner's inquest on April 17, 1961, had testified that Berlene Waters "said some name, I don't know what name it was, but she said that the fellow had shot the man."

The government thereupon developed [5] that Mitchell on April 11, 1961 had signed and given to the police a detailed statement as to what he saw and heard. The circumstances follow.

Called as a government witness, Mitchell freely testified that upon hearing the shot he went out to investigate. His house was next to the alley. Outside he saw Berlene Waters, he said. Then, variously, he answered he had seen no *man;* or he saw one run by the house, but did not know who it was; or he could not say whether the person was "male or female" and "whoever it was, was kind of slim fellow or lady." The prosecutor brought out that Mitchell had talked with him in his office. Q. "Do you remember telling me that you had seen running beside the house a tall, colored male?" A. "No.".

Objection was made that the government was impeaching its own witness. Then the prosecutor declared surprise, and in a bench colloquy which followed, the trial judge called attention to D.C. Code, § 14–104 (1961) which reads:

"Whenever the court shall be satisfied that the party producing a witness has been taken by surprise by the testimony of such witness, such party may, in the discretion of the court, be allowed to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to such party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause; but before such proof can be given the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made such statements and if so allowed to explain them."

Exercising the discretion afforded by the statute,[6] the trial judge properly permitted the prosecutor to exhibit to Mitchell the statement of April 11, 1961 after Mitchell testified he had given the police a statement. He then recognized and identified his signature.[7] "Read it to yourself," the judge directed, and then asked, "Does it or does it not refresh your recollection?" The witness answered in the affirmative. He thereupon was permitted to testify directly (and we summarize) that as he went out to investigate, he saw "a tall colored fellow" come out of the alley and run past his door; that he then saw Berlene Waters coming out of the alley, and he asked her where she was going. She ran up to him and said "Freddie shot a man." [8] Mitchell did not know what "Freddie" she referred to

5. The ruling was correct. The government had ample basis for anticipating that under oath and in court, the witness would testify in accordance with his signed statement of April 11, 1961. United States v. Graham, 102 F.2d 436, 442 (2 Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939) ; Carrado v. United States, 93 U.S.App.D.C. 183, 192, 210 F.2d 712, 721, cert. denied, 347 U.S. 1018, 74 S.Ct. 784, 98 L.Ed. 1140 (1954).

6. And see United States v. Graham, supra note 5, 102 F.2d at 441.

7. Bedell v. United States, 63 App.D.C. 31, 68 F.2d 776 (1934), Smith v. United States, 57 App.D.C. 71, 17 F.2d 223 (1927).

8. The trial judge instructed the jury that the evidence of what was said by the "excited" Berlene Waters "was admitted on the basis that such statement, if made, was a spontaneous utterance immediately following the shot in the alley." Cf. Wheeler v. United States, 93 U.S.App. D.C. 159, 164–65, note 11, 211 F.2d 19, 23, 24 (1953), cert. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954). In Wheeler, we also pointed out that the statute merely codifies the established rule concerning the impeachment of one's own

It is argued that the statute in terms precluded any such use of the impeaching material as was here permitted. Had Mitchell *denied* giving a statement to the police, the prosecutor might have produced the earlier contradictory text for the purpose of affecting Mitchell's credibility and so that the government would not be bound by the unexpected testimony.[9] If Mitchell had persisted in his denial of or had repudiated the statement, a careful instruction would have been in order so that the jury would disregard and give no evidentiary effect to the contents of the statement.[10]

Here, however, the statement was not received in evidence. Moreover, Mitchell affirmed its truth. Accordingly, his testimony with his recollection refreshed, was to be received and weighed in the usual manner, and no special instruction was required.[11] It remained for the jury to evaluate whatever Mitchell said at whatever time shown.

We have fully considered all appellant's attacks upon other rulings. Certainly no unlawful prejudice stems from Mitchell's identification of Berlene Waters. Robinson's mother testified, "Everybody knows Berlene." On cross-examination Mitchell's long and intimate acquaintance with the Waters woman was fully established. It is reasonable to conclude that the various police officers responding to Marie Witcher's phone call after the shooting, encountered scant difficulty in placing Berlene Waters at the scene. Her subsequent arrest and the implication of Robinson were but prelude to the confrontation already described.

Appellant's counsel seems to argue that since Berlene Waters was later found incompetent to stand trial, the court could not, on that account, receive evidence of what she said, either to Mitchell at the time of the crime or later to Robinson in the cellblock. Such is not the law.[12] Finally, he argues that her statements were self-serving, and on that account should not have been received. But that objection clearly goes to the weight and not to the substance of the testimony.

We find no error affecting substantial rights of the appellant.

Affirmed.

witness. 93 U.S.App.D.C. at 165, 211 F. 2d at 25.

9. Smith v. United States, supra note 6; Carrado v. United States, supra note 5.

10. Bedell v. United States, supra note 6; Wheeler v. United States, supra note 7, 93 U.S.App.D.C. at 164–66, 211 F.2d at 24–26.

11. Hyde v. United States, 35 App.D.C. 451, 481–83 (1910), aff'd, 225 U.S. 347, 378, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Zimberg v. United States, 142 F.2d 132, 136–37 (1 Cir.), cert. denied, 323 U.S.

712, 65 S.Ct. 38, 89 L.Ed. 573 (1944); Harman v. United States, 199 F.2d 34, 36 (4 Cir. 1952).

12. 6 Wigmore, Evidence § 1751 at 156 (3d ed. 1940); McCormick, Evidence § 272 at 582 (1954). Indeed, insane people have been held to be competent witnesses at trial. District of Columbia v. Armes, 107 U.S. 519, 2 S.Ct. 840, 27 L. Ed. 618 (1883); Shibley v. United States, 237 F.2d 327, 334 (9 Cir.), cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 77 (1956).