COMMONWEALTH *vs.* KARL G. EISEN.

Plymouth. January 4, 1971. — February 26, 1971.

Present: TAURO, C.J., CUTTER, SPIEGEL, REARDON, & QUIRICO, JJ.

*Evidence,* Admissions and confessions; Opinion: expert. *Homicide.*

Incriminating statements made by the defendant in a capital case on the day on which the bodies of the victims were found in his home and on the following day were properly admitted in evidence at his trial not only as to his guilt but also as evidence of his mental competency to make them. [745]

An opinion of an expert allegedly based on hearsay evidence was properly admitted at a criminal trial where the hearsay evidence was introduced by the defendant on cross-examination of the expert. [745]

An assistant medical director at a State hospital to which the defendant in a capital case was committed for observation soon after discovery of the crime was qualified to give his opinion concerning the defendant's mental competency. [745-746]

At a trial in which the defendant was convicted of murder in the first degree of his wife, where there was evidence that the victim died as the result of an extensive head wound, photographs of which were in evidence, inflicted by a heavy, blunt instrument applied with moderate to severe force, there was no error on the part of the judge in submitting to the jury the question of extreme atrocity or cruelty in the killing within G. L. c. 265, § 1. [746]

The portion of G. L. c. 265, § 1, which defines murder committed with "extreme atrocity or cruelty" as murder in the first degree is not void for vagueness. [747]

Two INDICTMENTS found and returned in the Superior Court on January 13, 1967.

The cases were tried before *Smith, J.*

*Alexander Whiteside, II (Reuben Goodman* with him) for the defendant.

*Brian E. Concannon,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J. The defendant appeals under G. L. c. 278, §§ 33A–33G, from convictions of murder in the first degree of his wife and daughter on or about November 2, 1966. The jury recommended that the death penalty be not imposed.

The defendant argues three points: (a) That the court erred in the admission in evidence of certain incriminating statements made by the defendant on the ground that the defendant was mentally incompetent to make them. (b) That the court erred in admitting hearsay evidence concerning the defendant's mental condition and in not striking out opinion evidence based on this hearsay evidence. (c) That the court erred in submitting to the jury the issue of extreme atrocity and cruelty and in the alternative that G. L. c. 265, § 1, "is so vague and indefinite, as regards extreme atrocity and cruelty, that it is unconstitutional."

The evidence pertinent to these issues is summarized. The forty-one year old defendant, his wife and four minor children had lived in Kingston, Massachusetts, for several years. The defendant was employed in a local appliance store and enjoyed a favorable reputation in the community. The bodies of the decedents were found in the defendant's home on November 4, 1966. There was expert testimony that both victims had died approximately twenty-four to forty-eight or as many as seventy-two hours prior to the autopsies performed the evening of November 4. The defendant's wife Margot Eisen died as the result of an extensive wound over the right eye, inflicted by a heavy, blunt instrument and his fourteen year old daughter Gabrielle Eisen died as a result of multiple (nine) blunt injuries to the head. The examination of an axe found in the defendant's house revealed the presence of human blood and hairs. Human blood was also found on the defendant's clothing at the time of his arrest. The defendant was seen by a neighbor going into his house the day following the killings and leaving the house after a brief stay. He was arrested on November 5, 1966, in Connecticut. The defendant was committed for observation to Bridgewater State Hospital on November 7, 1966. On December 2, 1966, no diagnosis had been

made and he was granted another period of observation. On December 29, 1966, a diagnosis was made of psychotic depressive reaction and he was found to be incompetent to stand trial. Approximately one year later, the defendant was adjudicated as competent to stand trial.

Subject to the defendant's exceptions the following evidence was admitted. On Friday, November 4, 1966, Marcia Reid received a telephone call from the defendant who asked her to call the police; the defendant did not sound excited or disturbed. She turned the telephone over to her husband Kenneth Reid. The defendant told him that he had done something terrible; that his wife and daughter were dead at home, but "he couldn't go through with it with the other children," and had them locked in a motel room.

On the morning of November 4, 1966, the defendant telephoned Mrs. Margaret Bernardo and told her that his wife and daughter had been dead at home for two days and that he was in Canada with three of the children. He asked, "What shall I do?" On the same day Mrs. Bernardo received a letter in a handwriting similar to the defendant's. The substance of the letter was that the defendant was in love with Mrs. Bernardo and that he was going to kill himself to prove it. Mrs. Bernardo testified that in early October, 1966, the defendant had forced her car off the road and told her that he hated his wife. "He wanted me to go away with him, and if I didn't, that he would kill himself and his wife and his children, because his children and his wife couldn't get along without him if he were dead." About one week before November, 1966, Mrs. Bernardo received a telephone call from the defendant who said that he would kill himself and his family if she did not go away with him.

James R. Goonan, chief of police of Kingston, testified that on November 5, 1966, the defendant had said to several policemen, "I know I haven't got to say anything, but I got to say this. How can you people be so nice to me after what I have done?" One Milton Young, who had been hunting in Connecticut on November 5, 1966, testified that the de-

fendant approached him and said, "I killed my wife and daughter. Call the police. I've had it."

Somewhat similar incriminating statements to other people were admitted without objection. Detective Charles Sanga of the Connecticut State police testified that on Saturday, November 5, 1966, he had been called to a State forest in Connecticut. When Detective Sanga saw the defendant, he asked him if he was Karl Eisen, and the defendant replied. "Yes I am, I did it, I did it, I did it." Another State police officer who accompanied Detective Sanga testified to the same effect.

Dr. Samuel Allen, who was the acting medical director at Bridgewater State Hospital, testified that the defendant was suffering from a psychotic depressive reaction at the time he was admitted to Bridgewater State Hospital on November 7, 1966; that he was rational before that time; and that the onset of the mental illness probably occurred when the defendant became aware that his wife and daughter were dead. In Dr. Allen's opinion, the principal cause of the illness was the defendant's knowledge of the deaths and his possible involvement in them; also for several months the defendant got progressively worse after admission to the hospital.

Dr. Robert R. Mezer, a psychiatrist called by the defence, first saw the defendant on November 11, 1966, and diagnosed his condition as "psychotic depressive reaction." This reaction was described as an abnormal sadness, depression and melancholy, a depression where the individual is so ill that he loses contact with reality and becomes unaware of what he is doing. In the opinion of Dr. Mezer, the reaction began sometime between March 21, 1966, when Eisen's wife attempted suicide, and May, 1966, when she was discharged from the hospital. In his opinion, the defendant was suffering from this condition on November 2, 1966, and it prevented the defendant from substantially conforming his behavior to normality or rationality, and the defendant's confessions and the killings themselves were consistent with a psychotic depressive reaction. If the de-

fendant had awakened and found the bodies of his wife and daughter and had had no memory of the events of the preceding evening, in the witness's opinion, the defendant would have believed that he was responsible for the killings.

The defendant's past life, as he outlined it to the jury, was fairly uneventful prior to the killings except for a period of years during World War II when he was a German prisoner of war in Russia.

The defendant testified that on Wednesday, November 2, he did not eat all day; late in the evening he had two small glasses of cognac and a bottle of beer and a sip from a second bottle of beer; he did not feel well — he was sick to his stomach; he arrived home about 10 or 10:30 P.M.; he felt miserable, he went to bed; the ceiling seemed to be turning. During the night he heard somebody crying. He could not awaken his wife; she did not move. He went upstairs to his sons' room and tucked them in bed. He next remembered awakening in broad daylight. He was kneeling by his son Dean's bed. He went downstairs and saw that his wife was dead. He covered her face with a pillow. He went upstairs and saw that his daughter was dead. The defendant woke up his other children and drove off with them. After completion of the defendant's direct testimony counsel moved to strike out the defendant's "admissions, confessions or statements." The court denied the motion and ruled that they were made voluntarily.

In rebuttal for the Commonwealth, Dr. Allen testified that the defendant was normal and rational on November 2 and that on November 3 he was no longer rational, normal and mentally healthy. "I think it came on quite suddenly when he discovered . . . [and] became aware of the enormity of his alleged offense." Dr. Lawrence J. Barrows, the assistant medical director of the Bridgewater State Hospital testified in rebuttal that the defendant was not suffering from a mental disease or defect on November 2, 1966, and "that . . . the enormity of the crime involved and the awareness of it suddenly . . . precipitated an acute psychotic depression,"

1. The incriminating statements by the defendant were properly admitted for jury consideration not only as to his guilt but also as evidence of his competency to make them.[1] It was for the jury to determine upon all the evidence whether "the mental infirmities of the defendant deprived him of the faculty of consciousness of the physical acts performed by him, of the power to retain them in his memory, and of the capacity to make a statement of those acts with reasonable accuracy. An insane person is not necessarily an incompetent witness." *Commonwealth* v. *Zelenski*, 287 Mass. 125, 129.

2. There is no merit to the contention that the judge erred in denying the defendant's motion to strike out Dr. Barrows's opinion evidence concerning the defendant's mental condition. The defendant argues that Dr. Barrows's opinion was based on hearsay evidence. The short answer to the defendant's objection is that the hearsay evidence of which he complained was introduced by the defendant while cross-examining Dr. Barrows [2] and thereafter the judge properly permitted the prosecution to further question the doctor on the same subject matter. Moreover, as assistant medical director at the Bridgewater State Hospital during the defendant's confinement, Dr. Barrows had ample basis

---

[1] Kenneth Reid described his telephone conversation with the defendant on November 4, two days following the homicide. "I'd say at the time he was pretty stable, as far as his voice goes, because I understood everything he told me to do." The defendant's voice was no different than the voice he had heard at other times when he talked to him. The witness testified: "He [the defendant] said that he had done something terrible, that his wife and daughter were dead at the home in Kingston, but he could not go through with it with the other children, that they were locked up in a motel room, they had enough food and drink, and he gave me a telephone number and a room number. . . . He just told me to call the police, and he hung up." This information tallies with that obtained from another witness.

Robert W. Pettit, coöwner and manager of a motel in East Hartford, Connecticut, testified that the defendant checked into his motel on November 3, 1966, about 4 P.M.; that he had three children with him; that he inquired as to the location of a drugstore and a restaurant; that on November 4 the defendant inquired as to directions to Cape Cod; and that on both occasions "he was neatly dressed, he was shaven, and definitely appeared sober. . . . He mentioned that he was very tired because he had been driving."

[2] The judge in reply to defendant's objection, stated, "On direct examination he [Dr. Barrows] could not have testified as to any hearsay, but you brought it out in cross-examination."

for the opinion he expressed concerning the defendant's mental illness, irrespective of the hearsay evidence. See *Davenport* v. *Haskell*, 293 Mass. 454, 459.

3. The trial judge properly submitted to the jury the issue of extreme atrocity and cruelty. "To authorize the presiding judge to submit this question to the jury, the evidence must be of such a character as to show that the crime was committed under circumstances indicating something more than ordinary atrocity or cruelty, and manifesting a degree of atrocity or cruelty which must be considered as aggravated and extreme. The nature of a question of this kind is such that it must largely be left to the determination of the jury. Of course, the evidence must be sufficient to justify the judge in submitting the case to the jury." *Commonwealth* v. *Knowlton*, 265 Mass. 382, 388. In the case at bar, the evidence indicates that Margot Eisen died as the result of an extensive head wound inflicted by a heavy, blunt instrument, perhaps an axe, applied with moderate to severe force. "This wound was long enough to extend from the hair-covered area of the scalp to the ear; and it had split the skull so that the intracranial cavity, the cavity containing the brain, was open, and one could see the brain through the wound." The bone of the skull beneath the wound was "fractured to pieces," and the brain was lacerated deeply. There was medical testimony that the size of the wound indicated that it could have been the result of more than a single blow. Moreover, the jury had the benefit of photographs of the inflicted wound. In the circumstances, we hold that the trial judge did not err in submitting to the jury the question of extreme atrocity or cruelty in the killing of Margot Eisen. See *Commonwealth* v. *Gilbert*, 165 Mass. 45 (killing apparently done by single blow with an axe); *Commonwealth* v. *Devereaux*, 256 Mass. 387, 394 (victim shot once and hit two or three times on the head with a gun butt); *Commonwealth* v. *Knowlton*, 265 Mass. 382, 385, 389 (the victim died from a single severe blow on the head); *Commonwealth* v. *Doherty*, 353 Mass. 197, 212–213 (defendants woke

up the victim, shot him through the chest with a shotgun at close range, and then dragged him to a doorway and let him go, apparently down the stairs).

4. We hold that G. L. c. 265, § 1, is not void for vagueness. The statutory language of "extreme atrocity or cruelty" has been applied frequently and for many years. These words convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States* v. *Petrillo,* 332 U. S. 1, 8. See *Commonwealth* v. *Alegata,* 353 Mass. 287, 302.

General Laws c. 278, § 33E, as amended through St. 1962, c. 453, "consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice." *Commonwealth* v. *Baker,* 346 Mass. 107, 109. After a very careful examination of the entire record, including more than 700 pages of transcript, "in all aspects of fact and law it is our conclusion that justice does not require another trial," *Commonwealth* v. *Harrison,* 342 Mass. 279, 297, or entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*