Karl G. EISEN, Petitioner, Appellant,

v.

Philip J. PICARD, Respondent, Appellee.

No. 71–1217.

United States Court of Appeals, First Circuit.

Heard Oct. 4, 1971.

Decided Dec. 14, 1971.

Alexander Whiteside, II, Boston, Mass., for appellant.

Bernard Manning, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen. and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Criminal Division, were on brief, for appellee.

Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Defendant appeals from the denial, without a hearing, of his petition for a writ of habeas corpus. He was convicted in the Superior Court of Massachusetts of murder in the first degree by extreme atrocity and cruelty.[1] The jury recommended that the death penalty not be imposed. The Supreme Judicial Court affirmed the conviction. Commonwealth v. Eisen, Mass., 267 N.E.2d 229 (1971).

At trial the evidence showed that Margot Eisen, defendant's wife, died of a single axe blow to the head and that Gabrielle, his daughter, died of multiple blows to the head. Their bodies were discovered on the morning of November 4, 1966. Expert testimony placed the time of death between the evenings of

---

1. "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree." Mass.Gen.Laws ch. 265 § 1. Because of our resolution of other issues in this case we do not reach the troublesome question of whether this statute as applied is impermissibly vague.

November 2 and 3, or perhaps as early as the evening of November 1. Prior to the discovery of the bodies on November 4 the defendant was seen going into his house and leaving after a brief stay. On November 5 he approached two hunters in the Connecticut woods, saying "Help, help. Shoot me. I killed my wife and daughter. Call the police." At that time he appeared nauseated and was wearing a red blanket over his head. The Connecticut State Police were called and when they arrived on the scene, defendant made further incriminating statements. He seemed very distraught, nervous, sick, appeared to have vomited and defecated on his clothing and was at times incoherent. He was taken into custody and on November 7 was committed to Bridgewater State Hospital where he was subsequently found incompetent to stand trial. More than a year later he was declared competent and his trial commenced in April 1968.

At trial one Marcia Reid testified that at about 11:30 on the morning of November 4 she received a telephone call from the defendant who said, "This is Karl," and asked her to call the police. He did not sound excited or disturbed. Mrs. Reid then turned the telephone over to her husband, Kenneth, who testified over objection that the defendant told him "that he had done something terrible; that his wife and daughter were dead at home in Kingston, but he couldn't go through with it with the other children. He had them locked in a motel room." Over similar objection a Margaret Bernardo testified that on the same morning the defendant telephoned her and said that his wife and daughter had been dead at home for two days and that he was in Canada with three of the children. He asked, "What shall I do?"

Chief Goonan of the Kingston police stated over objection that on November 5 while in custody the defendant said to him and several other policemen, "I know I haven't got to say anything, but I got to say this. How can you people be so nice to me after what I have done?"[2] Somewhat similar incriminating statements made to other officers at the time of defendant's arrest were admitted without objection. Detective Sanga of the Connecticut State Police testified that on Saturday, November 5, he was called to a state forest in Connecticut. There he asked the defendant if he was Karl Eisen who was wanted by the Massachusetts police authorities, and the defendant replied, "Yes I am, I did it, I did it, I did it." Another State police officer who accompanied Detective Sanga testified to the same effect.

The defense was based on insanity. The defendant took the witness stand and stated as follows: on Wednesday, November 2, he did not eat all day; late in the evening he had two small glasses of cognac and a bottle of beer and a sip from a second bottle of beer; he did not feel well—was sick to his stomach; arrived home about 10 or 10:30 p. m.; felt miserable and went to bed. The ceiling seemed to be turning. During the night he heard somebody crying. He could not awaken his wife; she did not move. He went upstairs to his sons' room and tucked them in bed. The next thing he remembered was awakening in broad daylight, kneeling by his son Dean's bed. Then he went downstairs and saw that his wife was dead. He covered her face with a pillow, went upstairs and saw that his daughter was dead and placed a bureau in front of the door to her room. The defendant woke up his other children and drove off with them. His memory of the events between November 3 and 5 was very incomplete, and he maintained that he had no further recollection of the events of the night of November 2. Defendant's medical expert testified that he was insane on the date of the crime.

---

2. Although Chief Goonan relayed to the defendant instructions from an attorney to make no statements, he did not otherwise advise the defendant of his constitutional rights. Defendant had previously been advised of his rights by the Connecticut police, and his statement indicated an awareness of his right to remain silent.

At the close of the defendant's direct testimony, his attorney moved to strike all inculpatory statements made by the defendant, oral or written. This motion was predicated on the testimony of the medical experts that the defendant was insane at the time these statements were made. The motion was denied.

In this petition two issues arise from defendant's claim of insanity: whether his in-custody statements were voluntary and whether his noncustodial inculpatory statements were competent.[3] A review of the expert testimony on defendant's mental condition is a prerequisite to any consideration of these issues.

Dr. Mezer, defendant's expert, testified:

"[Defendant's] psychotic-depressive reaction began some time between March 21, 1966, when Mr. Eisen's wife took an overdose of barbiturates in a suicidal attempt. It was after that period of time; during the period of time when she was in the hospital.

" .   .   .   .

"It was during this period of time that Mr. Eisen's depression began, because he had to take care of the children, and wasn't able to concentrate on his work; and the bills piled up.

So, that's really the beginning of the depression."

Dr. Allen, the state's medical expert, conceded that the defendant was insane and incompetent on November 7. Despite some initial reluctance to do so, he further stated that in his opinion the defendant was mentally ill and no longer rational on November 3.

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) requires a trial court to rule that statements to police officers were voluntarily made before they are submitted to the jury. The court's "conclusion that the confession is voluntary must appear from the record with unmistakable clarity." Sims v. Georgia, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). There is substantial doubt in the instant case that the trial court applied a proper test in determining the voluntariness of custodial statements to police officers. The court appears to have used the same standard for all its rulings on the admissibility of defendant's inculpatory statements.[4] While it considered it relevant that there were no threats, pressure, or suggestions by police officers, the court failed to take into account that the defendant's insanity may have deprived him of his freedom of choice, the essence of his ability to make a voluntary

---

3. The credibility of defendant's statements, properly a jury question, is not before us here. Moreover, in view of our disposition of this appeal, we do not reach the issue of whether a standard of voluntariness is applicable to non-custodial statements.

4. The court appears to have blurred the distinction between competency and voluntariness, as is evident from its ruling on the admission of Kenneth Reid's testimony of defendant's noncustodial statements:
   "It obviously was voluntary. It was made over the telephone; it wasn't made to anyone in authority.
   " .   .   ..
   "Obviously, it is not the result of any threats or pressure. Insane people can make confessions, under certain circumstances. Drunken people can make them.
   " .   .   ..
   "Well, I will admit the evidence—I will admit the alleged statement as a voluntary confession, having in mind that there is no evidence to indicate that the defendant, at the time of making the statement, was unbalanced. And I will leave it to the jury—as is the practice of any confession—I will leave it to the jury to say, in the last analysis, whether he was competent or not."
Subsequently defendant's statements to Margaret Bernardo and Milton Young (the hunter whom the defendant approached in the Connecticut woods) were admitted on the same grounds. It appears that statements to police officers were admitted essentially on the same basis.

confession. Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). In ruling on the motion to strike, the court had before it substantial evidence of defendant's insanity at the time of his custodial inculpatory statements. Yet neither in its ruling on this motion [5] nor in its charge to the jury [6] did the court appear to recognize that insanity relates to the issue of volition as well as to the issue of competence.

Commonwealth v. Zelenski, 287 Mass. 125, 191 N.E. 355 (1934), on which both the trial and the appellate courts relied, stands for the proposition that "it was for the jury to determine upon all the evidence whether 'the mental infirmities of the defendant deprived him of the faculty of consciousness of the physical acts performed by him, of the power to retain them in his memory, and of the capacity to make a statement of those acts with reasonable accuracy. An insane person is not necessarily an incompetent witness.' " Commonwealth v. Eisen, *supra* (citation omitted). Competency, not voluntariness, was at issue in *Zelenski*. Thus a finding of voluntariness using a test for determining competency is not adequate because it does not take account of the possible absence of free will. In discussing whether a confession is the product of a man's free will, the court said in Pea v. United States, 130 U.S.App.D.C. 410, 397 F.2d 627, aff'd on rehearing, 397 F.2d 627 (1968) (en banc):

> "The make-up of a free man includes his mechanisms for self-preservation, to refrain from speech that may endanger him. If he does speak out his statement is admissible as the reflection of his free will if his self-preservation mechanism, and its impetus to silence, is overridden by pressures within his own personality, by his own conscience, religious feelings, sense of duty, etc. But his statement does not reflect his own free will or intellect if his statement is attributable in critical measure to the fact that his self-protective mechanism is negated or overridden by external force or fraud, *a condition of insanity*, the compulsion of drugs." *Id.* at 634. (Emphasis added.)

Since it is clear that insanity may deprive a man of his ability to make a voluntary confession, Blackburn v. Ala-

---

5. "I will deny the motion and rule the statements were voluntarily made, in some instances to persons not in authority, by the defendant.

    "And on the theory of the Zelenski Case, an insane person or an intoxicated person may make a valid confession.

    "I will allow the statements to stand and instruct the jury at the appropriate time."

6. "Now, in this case here, I have admitted for your consideration statements alleged to have been made by this defendant:—'I did it, I did it,' and statements allegedly made over the telephone. Those are direct acknowledgments of guilt. But a humanitarian rule prevails in this Commonwealth.

    "The Trial Judge holds a preliminary hearing in the absence of the jury, as I have done in these cases. If he determines that *the confession was voluntary, made by a person with the mental competency to make it, he admits it for the consideration of the jury*. But the jury in turn may consider all of the evidence and make their own determination. It may be contrary to the finding of the Trial Judge. So, you may consider these alleged confessions, the manner in which they were made, by whom they were made, when. You may arrive at a different conclusion, or you may agree. It is for you to say.

    "There is some question here about the mental capacity of this defendant, it being alleged that he was mentally incompetent to make the confession. I invite your attention to the principles of law applicable:

    " 'An insane person is not necessarily an incompetent witness. A confession made by a defendant more or less under the influence of intoxicating liquor is not inadmissible as evidence unless the degree of intoxication is so great as to deprive him of understanding what he was confessing.'

    "And, again, a person who is of more or less mental instability arising from intoxication or insanity may make a valid confession." (Emphasis added.)

bama, *supra,* the failure of the trial court here to clearly consider whether defendant's confessions to the police officers subsequent to his arrest were the product of a rational intellect requires a reversal. In *Blackburn* the Court said:

"In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the' accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion." *Id.,* at 207, 80 S.Ct. at 280.

Although the foregoing disposes of this appeal, we nevertheless address ourselves to the issue of the defendant's competency, *i. e.,* his memory, at the time of his alleged noncustodial inculpatory statements. We do so because of the likelihood of their introduction at a new trial. It was conceded that the defendant was insane and incompetent to stand trial on November 7, and that he continued in that state for more than a year. The experts agreed that defendant had no memory of the events of the night of November 2 while at Bridgewater. The defendant's expert testified that this state of memory loss dated back to November 3, and that such memory loss was consistent with his mental condition. While he acknowledged that it was *possible* that defendant's memory was intact on November 3 and 4,[7] he stated that it was likely that upon discovery of the bodies defendant assumed responsibility for the deaths even though he had no memory of the crime and might in fact be innocent. The evidence, viewed as a whole, indicates a strong probability that defendant's admissions were the result of such an assumption or of an insane compulsion to confess and that they were not based on memory. Defendant's objection to the admission of these statements raised an issue which should have been resolved by the trial court on grounds more substantial than the barest possibility that they *might have been* competent.[8] In view of the nature and importance of defendant's inculpatory statements and his prima facie claim of

7. This is essentially the only evidence of defendant's ability to remember when the inculpatory statements were made.

8. *Cf.* Pittsburgh & W. Ry. v. Thompson, 82 F. 720 (6th Cir. 1897) (applying state law in terms of general common law principles of competency) where the court said, "That the person has been found insane, and is an inmate of an insane asylum, affords prima facie evidence that he is of unsound mind . . . and operates to throw the burden of proving competency upon the party offering him." *Id.* at 727.

Note also that the federal rule regarding testimony by insane witnesses is that their competence is to be determined by the trial court. District of Columbia v. Armes, 107 U.S. 519, 2 S.Ct. 840, 27 L.Ed. 618 (1882). We believe that in the absence of an opportunity to make a first hand determination of the witness's competence, as in the case of hearsay, there should be some reliable evidence that the witness's statements are competent where a *prima facie* case of incompetence has been made. The preponderance of cases following *Armes* deal with testimony at a proceeding where the court may observe the witness. *See, e. g.,* Carter v. United States, 332 F.2d 728 (8th Cir.), cert. denied, 379 U.S. 841, 85 S.Ct. 79, 13 L.Ed. 2d 47 (1964); Shibley v. United States, 237 F.2d 327 (9th Cir.), cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 77 (1956); In re Loughran, 276 F.Supp. 393 (C.D.Cal.1967). *But see* Robinson v. United States, 113 U.S.App.D.C. 372, 308 F.2d 327 (1962), cert denied, 374 U.S. 836, 83 S.Ct. 1887, 10 L.Ed.2d 1058 (1963) (hearsay of witness incompetent to stand trial); Lockard v. Parker, 164 F.2d 804 (4th Cir. 1947) (hearsay of plaintiff who testified at trial). Massachusetts law is essentially identical to the *Armes* rule. Commonwealth v. Reagan, 175 Mass. 335, 56 N.E. 577 (1900).

incompetence, we would look askance at their admission without reliable evidence indicating that they were in fact competent.

The judgment of the district court dismissing the petition is vacated. The case is remanded to the district court with instructions to grant the writ, unless, within a reasonable time set by the district court, the petitioner is retried by the Commonwealth.