COMMONWEALTH *vs.* WILLIAM MASSKOW.

Norfolk.   October 2, 1972. — December 1, 1972.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Evidence*, Admissions and confessions, Admitted without objection, Disclosure of evidence of insanity. *Error*, Whether error harmful. *Insanity*. *Practice, Criminal*, New trial.

At the trial of an indictment for murder, where there was substantial evidence that the defendant was insane at the time of making an in-custody statement admitting that he shot the victim, this court, assuming without decision that, in view of *Eisen* v. *Picard*, 452 F. 2d 860 (1st Cir.), the defendant's statement was improperly received in evidence, nevertheless held that, as there was overwhelming evidence apart from the statement that the defendant did the shooting, its receipt in evidence was harmless beyond a reasonable doubt [666–668]; the statement was, in any event, admissible on the issue of the defendant's sanity [668–669].

At the trial of an indictment for murder, where two psychiatrists called by the defendant testified that he was insane, and a third psychiatrist, who was of the same opinion, was available as a witness but was not called by either side, and where the defendant's counsel, although aware that the third psychiatrist had examined the defendant, had neither moved for production of his report, nor, apparently, requested it from the prosecutor, there was no basis for ruling that the psychiatrist's evidence was "suppressed" by the prosecutor after a "request" by the defendant. [669–670]

At the trial of an indictment for murder, testimony of psychiatrists as to the defendant's sanity, although unanimous, was not conclusive and it was open to the jury to consider other evidence in determining the defendant's criminal responsibility. [670–671]

Although an instruction that the jury "consider the presumption of sanity and give it such weight as . . . you think it is entitled to," was confusing and therefore undesirable, any confusion was dispelled by other language in the charge and in further instructions given in response to a question from the jury two and one-half hours after they retired. [671–672]

INDICTMENT found and returned in the Superior Court on September 30, 1966.

The case was tried before *Taveira,* J., and a motion for a new trial was heard by him.

*Alexander Whiteside, II,* for the defendant.

*John P. Connor, Jr., Assistant District Attorney,* for the Commonwealth.

BRAUCHER, J. This is an appeal under G. L. c. 278, §§ 33A–33G, from a conviction upon an indictment charging the defendant with the murder of his sister's husband. The defendant was arrested on August 17, 1966, shortly after the death of the victim. Until September, 1968, the defendant was deemed incompetent to stand trial, and the trial was held in May, 1969. There was a nolle prosequi of so much of the indictment as alleged first degree murder, and the defendant was convicted of murder in the second degree. In February, 1971, the defendant moved for a new trial, and the motion was denied in April, 1971.

The defendant argues two main points: first, that the judge erred in admitting in evidence the defendant's "confession" to a police officer while in custody, and second, that a new trial should be ordered because the prosecution withheld evidence of the defendant's lack of criminal responsibility and because justice so requires in view of the totality of the evidence. At the trial, the defendant made no attempt to controvert the evidence for the prosecution, but contended only that he was insane and was in no way responsible for what took place. Compare *Commonwealth* v. *Cox,* 327 Mass. 609, 610. Without objection the judge charged the jury that "there doesn't seem to be any dispute that this defendant shot and killed" the victim. In his motion for a new trial, the defendant asserted that the "sole defense in this case was that the defendant's mental condition was such that he was not criminally responsible for the alleged homicide." Some of the defendant's present contentions seem to run counter to his trial strategy. See *Commonwealth* v.

*Johnson,* 352 Mass. 311, 317, cert. dism. as improvidently granted sub nom. *Johnson* v. *Massachusetts,* 390 U. S. 511, 511n; *Commonwealth* v. *Earl, ante,* 11, 15.

We summarize first the evidence for the prosecution apart from any admissions of the defendant. He was thirty-five years old at the time of the shooting, and had lived in the same house with his sister for many years. The victim, her husband, had lived in the same house since their marriage in 1963. The defendant had an eighth grade education, a long history of alcoholism and possibly drug addiction, including hospitalization, ate tranquilizer pills "like candy," and never held a steady job. The victim regularly beat his wife, and the defendant observed many of the beatings. On quite a few occasions the defendant asked the victim to stop, but his sister told him not to interfere. The defendant kept guns as a hobby.

On the night of the shooting the defendant was last seen by his sister at supper with her father, her husband, and her five children. She last saw the victim when she went to bed about 9 or 9:30 P.M. About 1:30 A.M. the victim was shot in the head three times in his separate bedroom, probably while in a sitting position. About that time a next door neighbor, returning home after a work day ending at midnight, thought he heard a gunshot. Then the defendant, whom the neighbor had known about ten years, came along, called to the neighbor, threatened him with a gun, and shot at a car. The neighbor grabbed the gun when it fell out of the defendant's pocket, and the defendant fled. The neighbor asked his mother to call the police. The police came and arrested the defendant. Three bullets found in the victim's room and one found in the car at which the defendant had shot had been fired from the gun taken from the defendant. That gun required a separate pull of four to four and one-half pounds on the trigger for each successive shot. Ammunition taken from the defendant on his arrest was of the same make and caliber, and there was human blood on the defendant's shirt.

We next summarize the statements of the defendant which were admitted in evidence without any exception by him. The defendant, before he was arrested, told the neighbor that he had shot the victim because "[h]e twisted the dog's ear, hit my sister. . . . I ran into the bedroom. . . . I woke him up, told him I was going to shoot him, and I shot him. . . . I can shoot you, too. You coming with me? . . . If that is the cops, I will shoot it out with them." He wanted to make a telephone call, but not from the telephone in a nearby laundromat: "No, the cop is in there all the time and I know him and they have been looking for me and he will pick me up." Later he said, "If there is anybody in that car I will shoot them." Still later he said, "Stop. If you're thinking about running, don't, because I am a good shot. I can shoot you just like anything . . . . I can really shoot you." When he shot at the car, the neighbor said, "Sonny, cops are going to be coming," and the defendant said, "I know. We have to go hide somewhere." After the neighbor grabbed the gun, the defendant said, "Don't turn me in. I know a lot of . . . friends. If I can't get you, they will." When he was arrested, the defendant said to the arresting officers, "Shoot anyway. I am going to get the chair." When asked his name, he said, "I know my rights. I don't have to tell you anything." At the station he telephoned his father and said, "Dad, I am in a little bit of trouble. . . . I am in bad trouble." He then turned to an officer and said, "He deserved it. He beat up my sister and he punctured her eardrum." He also asked if he could be bailed.

1. *The "confession."* After the neighbor and two police officers had testified to the statements we have summarized, a third police officer testified that at the police station Captain Finn had warned the defendant of his rights. The officer was asked whether he heard the defendant say anything after he was warned of his rights. Over the defendant's objection and exception, the officer answered, "Yes." Without further objection the officer was asked, "What did he say?" and he an-

swered, "He came out with some beauties." The defendant objected that the witness should be asked whether "in his opinion the man knew what he was doing or knew what he was talking about." The officer testified, "Whether he understood it or not, it's a difficult question to answer. . . . No, I really couldn't answer whether he understood the questions or not. If he realized the depth of the questions, I don't know." Upon the defendant's renewed objection the judge ruled that he would permit testimony as to a statement made voluntarily by the defendant without a question, and that the defendant's lack of understanding "goes to the weight of the evidence." The defendant excepted to that ruling. In response to several further questions by the prosecutor, by counsel for the defendant, and by the court, without further objection or exception, the officer testified that the defendant "stated that he knew at the time Capt. Finn was a no good . . . [obscenity]," that Captain Finn asked, "Do you realize or do you understand what you are in here for?" and that the defendant said, "Yes, I know what I am here for, because I shot that . . . [obscenity] brother-in-law."

The defendant assigns as error the admission in evidence of his "confession" that he "killed" his brother-in-law, the judge's ruling that his understanding went to the weight of the evidence, and the consequent failure to consider whether the "confession" was voluntary, "the product of a rational intellect," citing *Eisen* v. *Picard,* 452 F. 2d 860, 865 (1st Cir.), cert. den. sub nom. *Picard* v. *Eisen,* 406 U. S. 950. The Commonwealth argues that the evidence was admitted without objection, and that the assignment of error therefore brings nothing before us. But we think the earlier exception sufficiently raised the question whether it was error to admit evidence of the defendant's in-custody inculpatory statement, if it "most probably was not the product of any meaningful act of volition." *Blackburn* v. *Alabama,* 361 U. S. 199, 211.

The defendant moved before trial to suppress all confessions in view of his rights to remain silent and to con-

sult with his attorney, without mentioning voluntariness or mental competency. The main evidence of the defendant's insanity was not introduced until after the challenged ruling, and the defendant did not request a voir dire or move to strike the testimony. The Commonwealth argues that in this situation the judge's ruling should be upheld, because it was correct at the time he made it. We pass this contention. See *Blackburn* v. *Alabama,* 361 U. S. 199, 209–210. Where, as in the *Blackburn* case, a conviction rests significantly on a full-fledged confession by the defendant, there is authority that, once it becomes apparent that the accused's mental condition is a factor that ought to be looked into in relation to the admissibility of his confession, the trial judge on his own motion should order a hearing on the defendant's capacity to make the confession. *United States* v. *Silva,* 418 F. 2d 328, 330–331 (2d Cir.).

Moreover, in *Eisen* v. *Picard,* 452 F. 2d 860 (1st Cir.), cert. den. sub nom. *Picard* v. *Eisen,* 406 U. S. 950, the Court of Appeals applied the *Blackburn* rule to inculpatory statements made by the defendant after he was taken into custody, including spontaneous statements to police officers. It was apparently that court's view that, if the trial judge has before him substantial evidence of the defendant's insanity at the time of such statements, it must appear from the record "with unmistakable clarity" that the trial judge considered whether the statements were "the product of a rational intellect." *Id.* at 863–865. The present record makes no such showing.

Our decisions are contrary to the decision in *Eisen* v. *Picard, supra. Commonwealth* v. *Reagan,* 175 Mass. 335, 340. *Commonwealth* v. *Zelenski,* 287 Mass. 125, 128–129. *Commonwealth* v. *Eisen,* 358 Mass. 740, 745. We are of course bound by decisions of the Supreme Court on questions of Federal law, but we are not concluded by decisions of other Federal courts, although we give respectful consideration to such lower Federal court decisions as seem persuasive. *Brown* v. *Palmer Clay Prod.*

*Co.* 290 Mass. 108, 110. *LaBonte* v. *New York, N. H. & H. R.R.* 341 Mass. 127, 130. In the present case, however, our decision is in effect reviewable by writ of habeas corpus in a United States District Court which would be bound by the decision in *Eisen* v. *Picard, supra.* It would be undesirable for us to affirm the conviction of a defendant if the inevitable consequence were that he would be released on a writ of habeas corpus. We therefore assume for the purposes of this case, without deciding, that *Eisen* v. *Picard, supra,* accurately states the Federal law.

In the *Eisen* case, unlike the present one, there was evidence indicating "a strong probability" that the defendant's noncustodial admissions were the result of his assumption of responsibility, "even though he had no memory of the crime and might in fact be innocent," or of "an insane compulsion to confess and that they were not based on memory." *Id.* at 865. But the court's opinion with respect to admissions to police officers during custody is not limited to such cases. Hence we assume that under the rule of the *Eisen* case there was error in the admission of the defendant's statement to police officers that he had shot his brother-in-law.

So far as that statement bore on the defendant's commission of the act, we have no difficulty in concluding that its admission in evidence was harmless beyond a reasonable doubt. See *Milton* v. *Wainwright,* 407 U. S. 371, 372–373. See also *Chapman* v. *California,* 386 U. S. 18, 24; *Schneble* v. *Florida,* 405 U. S. 427, 432. The evidence that the defendant did the shooting was overwhelming, apart from any admission by him. He took no exception to testimony of numerous similar admissions, and made no effort to controvert the evidence for the prosecution. In this setting the additional statement was inconsequential.

The statement also bore, however, on the issue of the defendant's sanity. That issue was fully contested, and we are unable to say that the statement was harmless. But we do not read the opinion in *Eisen* v. *Picard* to hold

that statements by an insane person are not admissible on the issue of his sanity. So to hold, at least where the statements have no other impact of consequence, would reduce the trial of the issue of sanity to an absurd game. The defendant's experts testified that he was not responsible, largely on the basis of statements made by him that were no more voluntary than his statement to the police officers. We do not believe that he can select some of his statements and insist that the issue of sanity shall be decided on the basis of the statements he has selected.

2. *The withholding of evidence.* Two psychiatrists testified for the defendant: Dr. Barrows, assistant medical director at the Bridgewater State Hospital, and Dr. Allen, acting medical director there. They had seen the defendant numerous times beginning soon after his arrest in August, 1966, and in their opinion he was not criminally responsible. A third psychiatrist, Dr. Coleman, had examined the defendant on behalf of the prosecution shortly before the trial in May, 1969, and was of the same opinion. The defendant and his counsel were aware that Dr. Coleman had examined the defendant, but had not seen his report and did not know what he would say. Dr. Coleman was present at the trial but was not called as a witness. The defendant made a sweeping motion that he be furnished with all evidence of an exculpatory nature, but withdrew the motion before trial. He never moved for production of Dr. Coleman's report, but in February, 1971, he moved for a new trial by reason of the "defendant's deprivation by the prosecuting attorney of Dr. Coleman's exculpatory evidence." The motion was denied and an exception taken.

Important to a claim of suppression of evidence by the prosecution are " (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Moore* v. *Illinois,* 408 U. S. 786, 794–795. It is established that Dr. Coleman's testimony would have been favorable to the defendant, but it would merely have added a third opinion in harmony with those of the

only two psychiatrists who testified. Its materiality seems marginal. See *Commonwealth* v. *Beneficial Fin. Co.* 360 Mass. 188, 317–318; *Commonwealth* v. *Cassesso,* 360 Mass. 570, 577–579. Moreover, we have no basis for ruling that the prosecutor "suppressed" the evidence after a "request" by the defendant. Counsel for the defendant claimed that he made a request, but the prosecutor had no memory of it, and the judge made no finding on the point. The prosecution had no duty to call the doctor to testify. *Commonwealth* v. *Cox,* 327 Mass. 609, 613–614. *People* v. *Norwood,* 5 Ill. App. 3d 130, 133. The defendant could have called the doctor as a witness, but did not, nor did he seek a recess to consider such a course. See *People* v. *Gendron,* 41 Ill. 2d 351, 359. We cannot say that the evidence was unconstitutionally withheld. *Commonwealth* v. *Earl, ante,* 11, 15–16, and cases cited. See *Commonwealth* v. *French,* 357 Mass. 356, 399; *Welch* v. *Beto,* 234 F. Supp. 484, 491 (S. D. Texas), distinguishing *Ashley* v. *Texas,* 319 F. 2d 80 (5th Cir.); *United States* v. *DeLeo,* 422 F. 2d 487, 498–499 (1st Cir.), cert. den. sub nom. *DeLeo* v. *United States,* 397 U. S. 1037.

3. *The "unanimous psychiatric testimony."* The defendant urges us to order a new trial because of the undisputed psychiatric trial testimony, which he says should have been reinforced by Dr. Coleman's testimony. The jury, he contends, may have been confused by the judge's instruction, to which no exception was taken, to "consider the presumption of sanity, and give it such weight as in your judgment you think it is entitled to." The cumulative effect, he argues, was to dilute the burden of the prosecution to prove sanity beyond a reasonable doubt, and justice therefore requires a new trial.

In two cases we have ordered new trials under G. L. c. 278, § 33E, because in the particular circumstances there were inadequate reasons to disregard unanimous medical opinion that the defendant was not sane. *Commonwealth* v. *Cox,* 327 Mass. 609, 615. *Commonwealth* v. *Smith,* 353 Mass. 487, 489. Compare *Commonwealth* v. *Ricard,* 355 Mass. 509, 515; *Commonwealth* v. *Smith,* 357

Mass. 168, 181–182. The present case ceased to be a "capital case" subject to § 33E, since the defendant was not "tried on an indictment for murder in the first degree." *Commonwealth* v. *Myers*, 356 Mass. 343, 346–347. Our power to set aside a verdict, apart from § 33E, in order to prevent a miscarriage of justice when a decisive matter has not been raised at trial, "has been sparingly used." *Ibid.*

This is not an appropriate case for the exercise of that power. The charge to the jury on the issue of sanity was strictly in accord with the standards laid down in *Commonwealth* v. *McHoul*, 352 Mass. 544, 555. "Judicial experience with psychiatric testimony makes it abundantly clear that it would be unrealistic to treat an opinion on insanity by an expert on either side of the issue as conclusive. That is no less so in a case where one party has not secured an expert to express a contrary opinion." *Commonwealth* v. *Smith*, 357 Mass. 168, 178. The defendant's conduct and his spontaneous statements, although characterized by a doctor as showing a "paranoid reaction," fully justified the jury in inferring that he had substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. There was evidence that he disliked the victim on rational grounds cumulated over a considerable period of time. There seems to be no dispute that he was mentally ill in some sense at most and perhaps all relevant times, but the question whether he was normal for other purposes is distinct from the issue of criminal responsibility.

As for the charge with respect to the presumption of sanity, we agree that an instruction to the jury to weigh the presumption may be confusing and is therefore undesirable. See *Brown* v. *Henderson*, 285 Mass. 192, 196 (concurring opinion of Lummus, J.) ; *People* v. *Munroe*, 15 Ill. 2d 91, 99 ; *State* v. *Green*, 78 Utah 580, 595. Here, however, the judge went on to say clearly that the burden was on the Commonwealth to prove beyond a reasonable doubt that the defendant was legally responsible. Two

and one-half hours after the jury retired, in response to a question from the jury, he repeated this instruction, this time without any statement that the jury should weigh the presumption. Any confusion generated by the original charge was thereupon thoroughly dissipated.

*Judgment affirmed.*