COMMONWEALTH *vs.* ROGER THOMAS GOULET.

Essex. October 6, 1977. — February 16, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, LIACOS, & ABRAMS, JJ.

*Constitutional Law,* Self-incrimination, Admissions and confessions. *Insanity. Evidence,* Admissions and confessions, Hearsay, Privileged communication.

At the trial for the murder of a woman with whom the defendant had been intimate for a considerable time before she broke with him and began seeing another man, upon which the defendant became visibly depressed and withdrawn, lay and expert testimony as to the defendant's mental and emotional predicament on the date of the crime was such that the judge's refusal to direct a verdict was not erroneous. [408-410]

At a murder trial in which criminal irresponsibility was a defense, where the judge's charge implied that the testimony of the defendant's psychiatric witnesses was to be devalued because the defendant did not take the stand, and the charge was followed by the judge's remarks dilating on how a jury are helped by a statement made by an observable witness, it was held that the serious incursion on the defendant's privilege was not purged by the judge's general charge on a defendant's constitutional right not to take the witness stand. [410-414]

At a trial for murder by shooting in which criminal irresponsibility was a defense, error in the judge's charge in stating the standard in *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967), so as to permit the jury to think it was enough for conviction that the defendant understood the moral dimensions of the shooting, and that a finding that he had capacity to control his conduct was not necessary, required reversal of the judgment, although the defendant had not objected to the charge. [414-416]

Where it appeared on voir dire at a murder trial in which criminal irresponsibility was a defense that when the defendant arrived at the police station the police, although aware that he had summoned a lawyer who was on his way, nevertheless proceeded to read him his Miranda rights, that in the midst of the reading the defendant blurted out incriminating words, and that no interrogation thereafter occurred, the

judge correctly ruled the words were admissible [417]; on the record made, the judge could conclude that the defendant was capable of intelligent decision when he uttered the words [417-418].

At a murder trial, testimony of a witness as to a conversation with the defendant about two years before the crime, in which the defendant reported words of the victim in talking with him, could have been admitted as evidence of his state of mind. [418]

At a murder trial in which the victim's ex-husband was a prosecution witness, it was error to allow his claim of the attorney-client privilege when asked on cross-examination if he had caused his lawyer to send a letter to the victim threatening an injunction if she did not bar the defendant from her house because the matter was not intended to stop with the lawyer but was to be communicated to the victim. [418-419]

INDICTMENT found and returned in the Superior Court on May 19, 1975.

The case was tried before *Bennett, J.*

*Harvey Brower* for the defendant.

*Michael T. Stella, Jr.,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. At trial in October, 1975, the defendant was convicted of murder in the second degree. He appeals pursuant to G. L. c. 278, §§ 33A-33G. There was solid proof that he shot and killed Marlene Saalfrank. Criminal irresponsibility at the time of commission of the act, however, was raised as a defense, and in that connection we hold that the judge committed errors which oblige us to reverse the judgment. We also discuss other matters that may arise on retrial.

1. *The evidence.* (a) *Commission of the crime.* The victim, a divorced woman who lived in Methuen with her three children, went to a garage attached to her house in the early morning of January 6, 1975. About six thirty the children and neighbors heard sounds as of gunfire. Rushing to the garage, the children found Marlene, covered with blood, lying on the floor. She died at a hospital later that morning. Death was caused by wounds from bullets fired from a .44 magnum revolver found at the scene. The weapon was owned by the defendant.

Several neighbors saw a figure running from the area of the Saalfrank house about the time of the gunfire noise. Among these witnesses was a newsboy who earlier that morning had seen a camper truck, which evidently was the defendant's, parked about 1,200 feet from the Saalfrank house. (The defendant's camper truck was missing from its usual overnight parking place about 6 A.M.) Shortly before 7 A.M. the defendant, seeming very upset and confused, appeared at the house of his friends Richard and Edna Plonowski and said, "I don't know if I am in trouble or I shot someone." Asked who it was, he said "Marlene." He said she was not dead but was screaming when he left her; that he had shot her with a .44 magnum but didn't know where his gun was. From the Plonowski house the defendant telephoned his brother Solomon and an attorney. Solomon picked up the defendant and drove him to the Methuen police station; on the way the defendant said he thought he had shot Marlene.

While being given his Miranda rights at the police station, the defendant interrupted to say, "Can I just say one thing? I did it, I didn't mean to, I am sorry," or, in the version of another police officer, "I did it, I didn't mean it." According to Solomon: "If I did it I am sorry, I didn't mean it." (There will be further references below to the happenings at the police station.)

(b) *Background as to criminal responsibility.* The following was in the background of the fatal occurrence and bore on the question of criminal accountability. The defendant, aged thirty-nine in 1975, twice married and divorced, had started dating Marlene about 1970 or 1971, a year after her divorce. From the testimony we cannot glean precisely the degree of their intimacy over the four-year period, but the defendant told a number of people that they planned to marry. He became in many respects a member of Marlene's household, made repairs around the house, and in 1973 took Marlene and the children on a vaction trip to Canada. According to disputed testimony, he lived in the house for a time. Despite his limited means, he gave Marlene many

gifts and seems to have helped her with groceries and pay-
ments for the house and car, often borrowing from a
brother to do so.

The defense invited the inference that the defendant's at-
tachment to Marlene became obsessional toward the end,
and that her rather contemptuous rejection of him drove
him to the homicidal act. Around March, 1974, there was a
quarrel during which the defendant punched Marlene hard
enough to give her a black eye. Then, or somewhat later,
Marlene broke with him and began seeing a William Wink-
ler. During fall, 1974, the defendant became increasingly
dejected. In October and later he wrote to Marlene's
parents apologizing for hurting Marlene and telling re-
peatedly of his great love for her. He spoke to a mutual
friend, Katherine Saab, and to Edna Plonowski in a similar
vein of frustration.

The defendant was hospitalized in November complain-
ing of severe stomach pains for which no serious physical
source could be found (a small hiatal hernia was recorded).
While in the hospital, the defendant asked to see a psychia-
trist and told his brother he had nothing to live for because
Marlene would not have him. Discharged from the hospital,
the defendant became visibly depressed and withdrawn. He
lost weight and had trouble sleeping. He wanted to commit
himself to Danvers State Hospital, but his mother dissuaded
him. Meanwhile he kept telephoning Marlene at her place
of work until her supervisor in December warned him off;
Marlene did not wish to speak with him.

On December 12 the defendant as a private patient saw
Dr. Jorge DeNapoli, a psychiatrist. Dr. DeNapoli testified
that he found the defendant fearful and depressed and in
the first stage of a suicidal process. His diagnosis was de-
pressive neurosis and he prescribed a tranquilizer and an
antidepressant.

After an interval at Christmas when Marlene went to a
party with the defendant and the Plonowskis, the defendant
lapsed back into depression. New Year's Eve the defendant

spent alone, refusing a brother's invitation to a family party.

During the week or so before the shooting the defendant conversed with Marlene's ex-husband, Joseph Saalfrank, Sr., and with Richard Plonowski. He told Saalfrank he had purchased tickets in the summer for a New Year's Eve party but Marlene refused to join him unless he would lend her money. He begged for advice how to satisfy Marlene and said, "If I can't have that woman I will leave her so no other man will ever want her." To Plonowski the defendant related that Marlene was being unfaithful to him. He had gone to her house and seen her on the couch with a man. The defendant also said he had had a visit at his room from a man who told him to keep away from Marlene as he was her new boy friend.

Elements both of seeming instability and rationality mingled in the defendant's behavior immediately after the killing. He appeared quite unhinged at the Plonowskis' but, as noted, had the wit to call Solomon and a lawyer. One police officer testified that the defendant was dazed and crying at the station; another, that he seemed in a "state of shock," as if he was about to "flip out." But after interrupting the Miranda reading, the defendant asked that it be repeated, said he had better not talk, conversed with his brother in French, and when the lawyer arrived was sufficiently in possession of himself to give a police officer at least some of the information needed to complete the booking slip.

(c) *Expert opinions.* Dr. Nicholas D. Rizzo, a psychiatrist employed at the District Court of Lawrence, was called by the defense. He examined the defendant on the morning of January 6 on court order, and again in June, 1975. He described the defendant's condition that morning as hysterical amnesia ("fugue"): he was confused, slow to make associations, and had blocked out part of the event. He was suffering from a "progressive depressive reaction" which brought on the amnesic state. In this fugue condition he would perform normally certain mechanical acts and make intelligent decisions on some matters, but would depart otherwise from

his normal patterns and do things he could not later recall. Dr. Rizzo concluded that the defendant at the time of the shooting was not criminally responsible.[1] Cross-examination of Dr. Rizzo focused on the fact that his knowledge of the circumstances of the killing and his conclusion of criminal irresponsibility had derived from the statements made to him by the defendant, who might be an untrustworthy source.

Also appearing as a defense witness was Dr. Dubravko Kuftinec, a psychiatrist with training in forensic psychiatry (once employed by the Commonwealth as a director of psychiatry). He examined the defendant twice in early spring, 1975. The defendant told him, as he had told others, of his love for Marlene, his physical decline in fall, 1974, his discovery that Marlene was cheating, and the visit of the new lover. He said he had had a telephone call from Marlene's daughter which related that Marlene was cheating. He told Dr. Kuftinec (as he had indicated to Dr. Rizzo) that discovery of Marlene's unfaithfulness had led him to decide to commit suicide and it was with this intention that he had gone to her house on the morning. Dr. Kuftinec's diagnosis was depression, with the conclusion that the defendant had been irresponsible.[2] This conclusion, according to the witness, was not confounded by the defendant's rational actions such as telephoning a lawyer and conversing in French. Again cross-examination challenged the opinion by questioning the validity of the account given by the defendant.[3]

On the part of the prosecution, one expert was offered, Dr. David D. Swenson, employed by the Commonwealth as

---

[1] It was Dr. Rizzo's opinion that the defendant both lacked the ability substantially to appreciate the wrongfulness of his act and was unable to conform his actions to the law. See the discussion below of the standard of *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).

[2] He testified to the same dual propositions as Dr. Rizzo, see note 1 *supra*.

[3] Dr. DeNapoli did not testify on the issue of criminal responsibility at the critical time because he had seen the defendant only in December. He testified, however, that a person in the defendant's condition in December could react to further rejections and emotional trauma by becoming so depressed that he would lose control of himself.

a regional director of legal medicine. He had examined the defendant twice in September, a month before trial. Like the other three psychiatrists, Dr. Swenson held that the defendant was suffering from mental disease — a psychoneurotic condition. But Dr. Swenson distinguished this from a condition of psychosis. For Dr. Swenson, it would be a rare case in which a person not suffering from psychosis would be criminally irresponsible. Here, indeed, the depression was "mild," as indicated by Dr. DeNapoli's prescription. The witness noted the lack of a documented history of past illness (although indications of psychological problems and possible mental illness could be found in the defendant's military records). In finding insufficient evidence of irresponsibility, Dr. Swenson expressed skepticism about the truthfulness of the defendant's statements to him.

The foregoing summary of the lay and expert testimony going to the defendant's mental and emotional predicament on January 6 leaves the evidence, as to weight, where it could not be said that the refusal of the judge to direct a verdict was erroneous. See *Commonwealth* v. *Walker*, 370 Mass. 548 (1976); *Commonwealth* v. *Kostka*, 370 Mass. 516 (1976). But other actions of the judge were in error, and seriously so.

2. *Erroneous rulings.* (a) *References to defendant's failure to take the stand.* The judge instructed the jury as follows: "[W]e have instances in this case where Mr. Goulet told doctors about things that he saw, and the doctors reported this when they testified. How are you going to assess whether or not that was true? Not whether or not Goulet made the statement, but whether he was truthful when he told the doctors about what he saw. How are you going to assess it?

"One of your principal jobs and one of the reasons there are so many of you is to assess the credibility of witnesses. If they are on the stand you can do it. If they are not on the stand how can you do it? You have to make up your mind how much weight can you give to [a] statement that you

heard when you can't observe the person who is reported to have made the statement."

This charge was objected to by defense counsel as violating the Fifth Amendment to the United States Constitution (paralleled in art. 12 of our Declaration of Rights) in that it "clearly puts the burden upon the defendant to take the stand and testify." The judge overruled the objection, and exception was claimed. We think the exception must be sustained and the error undermines the judgment.

The judge's remarks went beyond a generalized caution about the unreliability of hearsay to focus on the defendant and his silence. The clear implication of the charge was that the testimony of the psychiatric witnesses for the defense was to be devalued because the defendant did not take the stand to allow the jury to hear at first hand the out-of-court assertions of fact and intention he had made to the doctors, and to appraise their truth.[4] The jury were told in substance that the defendant's decision to remain silent had obstructed the truthseeking process, with the suggestion that the defendant had taken that decision because he feared what the jury's appraisal of his direct testimony was likely to be. The point was rubbed in by the judge's remarks, following upon the charge excepted to, dilating on how a jury are helped in assessing the value of a statement when it is made in the court room by a witness whose demeanor can be observed.

---

[4] In *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977), we held that statements to an examining psychiatrist are within the reach of the Fifth Amendment and art. 12 privilege against compelled testimony. We also held that, when a defense of criminal irresponsibility is raised and the defendant intends to present the evidence of experts who have examined him, he will be taken to have waived the privilege to this extent: he may be required to submit to examination by a court-appointed psychiatrist. This waiver is implied in the interest of giving the Commonwealth a fair chance to present countervailing psychiatric testimony; it is not to be understood as a complete relinquishment of the Fifth Amendment and art. 12 privilege which could allow pressure on the defendant to take the witness stand. To attach such a waiver to the defendant's calling a psychiatrist would, we believe, burden the fundamental privilege unnecessarily and put the defendant to a cruel choice.

The law in this Commonwealth has long been that art. 12 prohibits any comment by the judge which can be fairly understood as permitting the jury to draw an inference adverse to the defendant from the fact of his failure to testify. *Brown* v. *Commonwealth,* 335 Mass. 476, 481-482 (1957). *Opinion of the Justices,* 300 Mass. 620 (1938). *Commonwealth* v. *Maloney,* 113 Mass. 211, 214 (1873). The strength of this prohibitory rule is exemplified by the old case of *Commonwealth* v. *Harlow,* 110 Mass. 411 (1872). The trial judge charged "that nothing was to be presumed against the defendant herself for not testifying in her own behalf," but he added "that the failure of a defendant to produce evidence which it was in his power to produce . . . was a competent and proper matter for [the jury] to weigh in considering the question of his guilt." *Id.* at 411-412. These remarks were not necessarily directed at the defendant's failure to testify; they could be read instead as referring to her failure to produce other witnesses. But because the judge did not so qualify them, a possibility remained that they would be taken to allude to the defendant's own silence. We reversed Harlow's conviction, saying: "The omission of every qualification might lead the jury to understand that though his neglect to testify did not raise a presumption against him, yet they might weigh the fact and allow it to have such influence as they thought it deserved. The instruction was at least equivocal, in a matter where it ought to have been clear, and we fear it operated unfavorably to the defendant." *Id.* at 412.

Federal law, starting with the generalization that "the Fifth Amendment prohibits comment on the defendant's silence," *Griffin* v. *California,* 380 U.S. 609, 614 n.5 (1965), has also been thorough in searching out and condemning references, even though indirect, to the circumstance that a defendant has availed himself of his constitutional privilege. Thus a statement by the judge that the jury may give such weight as they think right to the fact that the defendant has not come forward to testify as to matters within his knowledge is clear reversible error. See *Government of V.I.* v.

*Bell,* 392 F.2d 207 (3d Cir. 1968); see also *State* v. *Kisik,* 99 N.J.L. 385 (1924). Cf. *United States* v. *Flannery,* 451 F.2d 880 (1st Cir. 1971) (prosecutor's improper comment); *Berryman* v. *Colbert,* 387 F. Supp. 378 (E.D. Mich. 1974) (same).

In the present case, the error was magnified by an episode preceding the charge. The jury had heard the prosecutor say in his closing argument that "[t]he Commonwealth has shown through rebuttal that what the doctors received, the three doctors by way of history from the defendant was not actually so." When this flat statement was objected to by defense counsel as going too far (cf. *Commonwealth* v. *Pettie,* 363 Mass. 836, 840 [1973]: the prosecutor should keep his comments "within the bounds of the evidence and the fair inferences from the evidence"), the prosecutor made an effort to justify his statement. It was not a notably strong effort.[5] Nevertheless the judge overruled the exception without any curative remarks to suggest that it was for the jury to consider how far the "history" had been supported. Exception was noted.

The jury may well have accepted the prosecutor's assertion, for they heard not only the assertion and the objection, but the judge's overruling of the objection. All the more serious, then, was the violation of art. 12 and the Fifth Amendment in the judge's later charge. For the charge could be understood by the jury as a criticism of the defendant for failing to take the stand to defend what he told the physicians, which, according to an assertion judicially allowed to the prosecutor, had been disproved. Compare those decisions which hold that a prosecutor's statement that the government's evidence is uncontroverted — even if

---

[5] The prosecutor cited four matters: that there was no evidence the defendant "gave the victim his entire pay"; that there was "no evidence as to [the] alleged confrontation on the morning of January 5th" (apparently a reference to the visit of the new lover); that there was no evidence "that his work fell off at Phillips Academy" (where he was employed as a mechanic); and that there was evidence that the defendant and the victim had broken up in 1974 and the defendant dated someone else in the fall. These items were hardly central to the issue.

the statement be accurate — will justify reversal for burdening the defendant's privilege against self-incrimination, if the defendant is the only person who could have contradicted the evidence. See *Commonwealth* v. *Borodine,* 371 Mass. 1, 10 (1976), cert. denied, 429 U.S. 1049 (1977); *United States* v. *Medina,* 455 F.2d 209 (1st Cir. 1971); *Rodriguez-Sandoval* v. *United States,* 409 F.2d 529, 531 (1st Cir. 1969); *Desmond* v. *United States,* 345 F.2d 225, 226-227 (1st Cir. 1965); Annot., 14 A.L.R.3d 723 (1967).

Quite apart, however, from the aggravating circumstance mentioned, we think the incursion on the defendant's privilege was serious and not purged by the judge's general charge that a defendant has a constitutional right not to take the witness stand. Such a general charge did not cure the fault in *Commonwealth* v. *Harlow,* discussed above. We emphasize that in the present case it was the judge who made the tendentious reference in his instructions to the defendant's silence. We have been firm in requiring curative action by the judge when a prosecutor is guilty of a similar lapse. See *Commonwealth* v. *Gouveia,* 371 Mass. 566, 570-571 (1976); *Commonwealth* v. *Morgan,* 369 Mass. 332, 338-344 (1975), cert. denied, 427 U.S. 905 (1976). Where the prejudicial remarks fall from the judge himself, the effect on the jury is likely to be more damaging, and corrective steps, if any can suffice, should be correspondingly strong. Here no such steps were taken despite the immediate objection.

(b) *Definition of criminal irresponsibility.* A further disturbing circumstance in this appeal is a confusion in the judge's charge about the standard of *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967). Under that case, the approved definition of criminal irresponsibility conforms to that of the Model Penal Code § 4.01(1) (Proposed Official Draft 1962): "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to

conform his conduct to the requirements of law." The definition is cast as a negative-disjunctive.

The judge here initially described the Commonwealth's burden of affirmative proof and so gave a definition of criminal responsibility in positive-conjunctive form — in effect, that the prosecution must show the defendant to have had substantial capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the law. At a later point he charged in the negative-disjunctive form of the Model Penal Code. When the judge concluded his instructions, the defendant's counsel objected in somewhat garbled fashion to the judge's charge in the positive-conjunctive, and also sought a charge on the Commonwealth's burden. Thereupon the judge charged in the positive-disjunctive as to the Commonwealth's burden — in effect, that the Commonwealth must prove that the defendant had substantial capacity *either* to appreciate the wrongfulness of his conduct *or* to conform his conduct to the requirements of law (the charge is reproduced in the margin).[6] This was the judge's last word on the subject to the jury, spoken just before they retired.

This final charge was incorrect, and the error, going to the heart of the defense, must be considered serious. Is it nevertheless to be cancelled because counsel did not object to the charge given (and invited the charge with a muddled request)? Such inattention of counsel is not to be condoned, and might in ordinary circumstances preclude review, but we have thought it proper in the past to overlook the fault when there was "a substantial risk of a miscarriage of justice" (*Commonwealth* v. *Franks,* 365 Mass. 74, 76 [1974]),

---

[6] "There was one thing that I said to you — I used the word, at least I am told that I did, and instead of or. And in order to be sure that I say this correctly I will now say this to you: The Commonwealth must convince twelve of you unanimously — this is the Commonwealth's burden of proof — unanimously beyond your reasonable doubt that this defendant Goulet did murder Marlene Saalfrank at the time of sufficient — strike sufficient — of substantial capacity to appreciate the wrongfulness of murder, or of substantial capacity to restrain himself from committing a murder."

and we have been especially sensitive to this risk in murder cases (see G. L. c. 278, § 33E, and, e.g., *Commonwealth* v. *Stillwell,* 366 Mass. 1, 2 n.2 [1974], cert. denied, 419 U.S. 1115 [1975]; *Commonwealth* v. *McAlister,* 365 Mass. 454, 457 n.1 [1974]; *Commonwealth* v. *Lussier,* 364 Mass. 414, 425 [1973]), as well as in other cases where the instructions incorrectly defined the crimes in issue. See *Commonwealth* v. *Franks, supra; Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). See also *Commonwealth* v. *Marshall,* 373 Mass. 65, 71 (1977) ("If the law regarding insanity was misstated, the convictions should be reversed"); *Commonwealth* v. *Fields,* 371 Mass. 274, 277-278 (1976); *Commonwealth* v. *Conroy,* 333 Mass. 751, 756-757 (1956). In the very *McHoul* case, involving lesser crimes than murder, we overlooked counsel's failure to save an exception to an incorrect charge on criminal irresponsibility.[7]

We cannot assume that the jury disregarded the last, erroneous definition and harked back to the earlier ones; indeed the judge's incorrect formulation was prefaced by a remark indicating that his previous statements had been mistaken. Applying the erroneous definition, the jury might have thought it enough for conviction that the defendant understood the moral dimensions of the shooting (as evidenced, perhaps, by his surrender to the police and his exclamation at the police station) and that a finding by them that he had capacity to control his conduct was not necessary.

3. *Other matters that may arise on retrial.* Of the other assigned errors argued by the defendant, we consider those which may have relevance on retrial.[8]

---

[7] In *McHoul* the court rested on the circumstances that the error was related to another duly excepted to, and that the judge had been referred to the form of a correct charge.

[8] Thus we do not discuss the claim that the judge should have declared a mistrial when Marlene's ex-husband said, nonresponsively, that the defendant had threatened his life and his children's; the judge instead "struck" the statement. Also claimed as error was the judge's failure to take action on an objection to the prosecutor's remarks in his closing speech which appeared to allude to some incident, not of record, in which the defendant "hurt" Marlene.

(a) When the defendant arrived at the Methuen police station, the police, aware that he had summoned a lawyer who was on the way, nevertheless proceeded to read him his Miranda rights, commencing with: "Before I ask you any questions . . .." In the midst of the reading (but, according to one officer, after the statement that he had a right to remain silent), the defendant blurted out the incriminating words quoted in different versions above.

The words were ruled admissible by the judge after voir dire. We do not think the police were inhibited from reading the Miranda formula simply because they knew a lawyer had been called. Cf. *United States* v. *Pheaster,* 544 F.2d 353, 366-368 (9th Cir. 1976); *United States* v. *Davis,* 527 F.2d 1110 (9th Cir. 1975), cert. denied, 425 U.S. 953 (1976); *United States* v. *Hodge,* 478 F.2d 945, 947 (5th Cir. 1973). It is true that the defendant may have supposed from the preamble of the formula that the police might ask questions before the lawyer arrived, but he was informed at the same time that he could remain silent. In fact the lawyer was expected momentarily and no interrogation occurred. See *Brewer* v. *Williams,* 430 U.S. 387, 399 (1977) (5-4); *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966); *Pilcher* v. *Estelle,* 528 F.2d 623, 625 (5th Cir. 1976), cert. denied, 426 U.S. 953 (1977).

But the defendant goes on to argue that his spontaneous admission should have been excluded because not the volitional "product of a rational intellect." *Eisen* v. *Picard,* 452 F.2d 860, 865 (1st Cir. 1971), cert. denied, 406 U.S. 950 (1972). See *Commonwealth* v. *Masskow,* 362 Mass. 662 (1972); *Blackburn* v. *Alabama,* 361 U.S. 199 (1960). At voir dire there was opportunity to explore the issue. Counsel cross-examined the officers, who testified to their views of the defendant's condition when they received him at the police station, and Dr. Rizzo was called for the defense. On the record made, the trial judge could conclude that the defendant was capable of intelligent decision at that time. Contrast *Commonwealth* v. *Masskow* and *Eisen* v. *Picard,* both *supra.* We need not say whether a contrary conclusion

would be unreasonable.[9] We call attention, however, to the judge's omission to charge the jury to make their own decision on voluntariness before considering the defendant's utterance. The background of the "long-established" Massachusetts practice to put the question to the jury is described in *Commonwealth* v. *Harris*, 371 Mass. 462, 472-474 (1976), and need not be repeated here.

(b) Katherine Saab, a friend both of Marlene and the defendant, testified extensively about the favors the defendant had heaped on Marlene. She also testified to Marlene's reactions of ingratitude. She recounted a conversation she had had with the defendant in 1973 in which he said "[h]e had given her flowers and a cake for her birthday and twenty-five dollars because things were a little tight for him. And she threw it at him and commented, 'What do you think I am going to get —.'"" At this point the prosecutor objected and the remainder of the answer was excluded as hearsay. We believe the witness's answer could have been admitted as evidence of the defendant's state of mind rather than for the testimonial value of the defendant's report of Marlene's words (see *Commonwealth* v. *Fiore*, 364 Mass. 819, 824 [1974]; 6 J. Wigmore, Evidence §§ 1789-1790 [Chadbourn rev. 1976]; McCormick, Evidence §§ 249, 294 [2d ed. 1972]), although the lapse of time between the conversation and the homicide introduces a discretionary factor. Cf. *Commonwealth* v. *Kleciak*, 350 Mass. 679, 692-693 (1966).

(c) Joseph Saalfrank, Sr., Marlene's ex-husband, a prosecution witness, was permitted to assert the attorney-client privilege when asked on cross-examination whether he had caused his lawyer to send a letter to Marlene threatening her with an injunction if she did not bar the defendant from living in her house. An affirmative answer to the question, the defendant argues, would have tended to show the witness's

---

[9] We note that the judge on voir dire did exclude the defendant's repetitive remark that he had done the deed but had not meant to, made just after the Miranda rights were read to him. This must have gone on the ground that the defendant was so disturbed as not to have an understanding of his constitutional rights and so was incapable of a rational waiver.

bias against the defendant and to contradict the witness's earlier testimony that the defendant never lived at Marlene's house. We think the judge erred in allowing the claim of privilege because the matter was not intended to stop with the lawyer as a confidence, but was rather meant to pass to Marlene. See *Peters* v. *Wallach*, 366 Mass. 622, 627-628 (1975); *United States* v. *Tellier*, 255 F.2d 441, 447 (2d Cir. 1958); *Solon* v. *Lichtenstein*, 39 Cal. 2d 75, 79 (1952); 8 J. Wigmore, Evidence § 2311 & n.5 (McNaughton rev. 1961); McCormick, Evidence § 91, and cases cited at n.77 (2d ed. 1972).

*Judgment reversed.*
*Verdict set aside.*