## COMMONWEALTH
### vs.
## Thomas SPERRAZZA

### No. 77772

Superior Court
Commonwealth of Massachusetts

**March 29, 1982**

---

8. Another subcontractor was employed to finish it.

Robert Banks, Asst. D.A., counsel for plaintiff.

Norman Zalkino, counsel for defendant.

### FINDINGS AND RULINGS UPON THE MOTIONS OF THE DEFENDANT TO DISMISS AND TO SUPPRESS

On May 24, 1974, Donald A. Brown, a Boston police officer, was shot and killed during the course of a robbery at a Purity Supreme supermarket in the Roslindale

section of Boston.

"About 9 p.m. on February 21, 1975 [Thomas] Sperrazza and John Stokes picked up...Karen Spinney and Susan Webster, both 18 years old, at Webster's home in an automobile driven by Stokes. After several stops, they went to a Roslindale bar. [Sperrazza] and Webster went into the bar, and there was a confrontation between [Sperrazza] and Anthony DiVingo, who knew Webster. Later, outside the bar, [Sperrazza] fired a single shot from a revolver, which hit DiVingo and killed [Ralph Cirvinale] who was behind DiVingo. Immediately thereafter, Stokes came running across the street, firing several shots." **Commonwealth v. Sperrazza,** Mass. Adv. Sh. (1979) 2423, 2424 (Braucher, J.). Later that evening Sperrazza and Stokes murdered Spinney and Webster and the two thereafter buried the bodies "in a wooded area in Northhampton". **Id.** at 2424-2425.

On July 9, 1975, a Suffolk County Grand Jury indicted Sperrazza for murder of Cirvinale, assault with intent to murder while armed, and unlawfully carrying a firearm on his person. Sperrazza came to trial upon these charges in February, 1976, the prosecution being handled by Assistant District Attorney Phillip T. Beauchesne. Sperrazza was convicted of murder in the second degree and of the assault and firearm charges. He was sentenced to life imprisonment on the murder conviction, a concurrent 18 to 20 years on the assault charge, and 4 to 5 years, from and after the life imprisonment, on the firearm charge. **Commonwealth v. Sperrazza,** 372 Mass. 667, 668 (1977) (Braucher, J.).

In June, 1976, Sperrazza and Stokes were both incarcerated in Block A-2 Minimum at the Massachusetts Correctional Institution at Walpole. On June 14, 1976, Stokes was found by two other inmates stabbed to death in his cell.

On September 15, 1977, more than two and one-half years after they had disappeared, the remains of Spinney and Webster were discovered. On November 30, 1977, the Grand Jury for the County of Norfolk returned four indictments against Sperrazza, charging him with the kidnapping and murder of these two young women. "He was found guilty by a jury of all four offenses and sentenced to the Massachusetts Correctional Institution at Walpole to serve concurrent life sentences on the murder convictions, from and after [the previous life sentence arising out of the murder of Cirvinale] and concurrent 8 to 10 year sentences, from and after the life sentences on the kidnapping verdict." **Commonwealth v. Sperrazza,** Mass. Adv. Sh. (1979) 2423, 2424 (Braucher, J.). Sperrazza was thereupon returned to Walpole, to serve three life sentences, two of which are consecutive.

For some time prior to his conviction of the Spinney and Webster murders, attorneys in the office of the District Attorney for Suffolk County had suspected that Sperrazza was the murderer of Officer Brown and that he had been involved in various criminal activity with Myles Connor and Ralph Petrozziello. During October, 1979, Assistant District Attorney Beauchesne heard through Sergeant Robert H. Hudson, Chief of Detectives, Suffolk County District Attorney's Office, that Sperrazza might wish to cooperate with law enforcement officers and provide them information against others who had been involved in criminal activity with him.

Hudson asked Beauchesne, "If he [Sperrazza] were to talk, what sort of deal might be worked out? What do you think you can authorize?"

Beauchesne replied, "He'll have to plead to first degree murder in the Brown case and we'll ask for a concurrent sentence. If he cooperates, we will recommend no period of incarceration for his wife and mother-in-law [also suspected by authorities of participation in criminal activities] and use our best efforts to get him involved in the Federal Witness Protection Program." Beauchesne then alerted federal authorities that Sperrazza might be thinking about "coming in from the cold", see LeCarre', **The Spy Who Came In From**

The Cold (Coward-McCann, Inc., 1963), since he was also suspected of certain bank robberies which constituted violations of federal law.

When Hudson confirmed to Beauchesne that Sperrazza did, in fact, wish to cooperate along the lines Beauchesne had indicated he was willing to deal, Beauchesne secured authorization from the Suffolk County District Attorney to make the offer he had previously recounted and, on October 29, 1979, arranged for Sperrazza to be brought from Walpole to the Offices of the Department of Correction in Boston. In addition to Beauchesne, Sergeant Hudson was present along with two special agents of the Federal Bureau of Investigation.

When Sperrazza arrived, his first works were, "Tell me what the deal is."

Beauchesne reiterated the points set forth above and went on to say, "I want to know everything you've ever done and who you did it with."

Sperrazza indicated he was willing to cooperate and, after being fully, fairly, and carefully apprised of his **Miranda** rights, his "de-briefing" began. This meeting lasted nearly two hours and, during the interview, Sperrazza confessed to his part in the murders of Brown, Spinney, and Webster. During the course of the interview, when Sperrazza appeared wary, Sergeant Hudson reminded him that if he cooperated, the District Attorney for the County of Suffolk would recommend that the mandatory life sentence for the murder of Officer Brown be ordered by the court to run concurrent with the life sentences he was presently serving, and would recommend that his relatives get a suspended sentence for any criminal involvement on their part. Hudson then urged, in substance, that Sperrazza give law enforcement officials any and all data concerning his criminal involvement with Myles Connor. Indeed, the revelations made by Sperrazza during this interview concerning his part in the Spinney and Webster murders deeply implicated Connor as well. No mention whatsoever was made either by Sperrazza

of by his interrogators of the murder of Stokes in Walpole. Up to this point, no promise whatsoever had been made to Sperrazza that his statements, insofar as they had incriminated him, would not be used against him. Indeed, just the contrary warning was conveyed by the careful explanation of his **Miranda** rights.

In November, 1979, Connor was indicted for his part in the murders of Spinney and Webster. In December, 1979, Sperrazza was indicted for the murder of Officer Brown. At his arraignment in mid-December, Sperrazza had come to look upon Assistant District Attorney Beauchesne as his chief insurance against retaliation against him within the prison system. Accordingly, Beauchesne actually had to "vouch" for James Krasnoo, Sperrazza's appointed counsel, before Sperrazza would confide in him.

Mr. Krasnoo promptly and vigorously set out to define the "deal" that Sperrazza had made with the Suffolk County District Attorney's office. This was far more than an after-the-fact recordation of what had been agreed to earlier. The Suffolk County District Attorney naturally wanted more than Sperrazza's confession implicating Connor. The F.B.I. agents wanted him to testify against Connor in a federal bank robbery prosecution. Thus, the Beauchesne-Krasnoo discussions were in the nature of further negotiations rather than simply an explanation of what Beauchesne and Sperrazza had agreed. It was during these negotiations that Beauchesne told Krasnoo that, with the resolution of the Brown murder case, Sperrazza had ceased to be a target of "this office", i.e., the Office of the District Attorney for the County of Suffolk. Beauchesne then said broadly, "Anything we get will not be used against him [Sperrazza]." Beauchesne agreed that this was a promise. The murder of Stokes was never discussed between the two nor was it in contemplation by either one at the time.

Mr. Krasnoo proceeded to draft what, in a commercial context, would be called a letter agreement and later formally amended it to more specifically name the

relatives upon whose behalf the Office of the Suffolk County District Attorney was going to made certain recommendations. The central language from this letter agreement relative to the instant motions is as follows:

> With regard to any testimony that Mr. Sperrazza is to give in any judicial proceeding, be it Grand Jury or Courtroom, and with regard to any statement that Mr. Sperrazza may make relative to the above subject matter to any law enforcement agent from your office, the parties agree and understand that his testimony will not in any way be used against him and that in no way will his testimony serve as the basis for any future charges against him or against members of his family or of his wife's family.

Both Beauchesne and Krasnoo agree that these two letters express the "deal" Krasnoo had negotiated on Sperrazza's behalf and this Court finds that they constitute a full written integration of the agreement between Sperrazza and the Office of the District Attorney for the Suffold District.

Thereafter, the Attorney General having assumed responsibility for the prosection of Connor for his participation in the murders of Spinney and Webster, and having appointed Assistant District Attorney Paul Buckley of the Office of the District Attorney for the Suffolk District a Special Assistant Attorney General for that purpose, Krasnoo approached Buckley as attorney for Sperrazza to assure himself that the letter agreement negotiated with Beauchesne was in full force and effect as between Sperrazza and the Attorney General. Buckley assured him that it was. No mention whatsoever of the Stokes murder was made during the discussions leading up to this assurance nor was it in contemplation either by Special Assistant Attorney General Buckley or by Mr. Krasnoo.

On May 13, 1980, Sperrazza was called before the Grand Jury for the County of Norfolk and interrogated about the murders of Spinney and Webster. This recitation involved a discussion of the roles of both Stokes and Connor and, upon being informed that Stokes had been murdered in Walpole, an alert Grand Juror asked Sperrazza what he knew about Stokes' murder. This was the first time that anyone involved in the criminal justice system had interrogated Sperrazza about his knowledge of that subject. Sperrazza hesitated and Buckley asked him if he wished to speak with this lawyer. Sperrazza said he did wish to confer and was permitted to leave the room. When he returned, he testified that Mr. Krasnoo had advised him "not to talk about that case at this time."

During that same month, Connor was brought to trial in the United States District Court for the District of Massachusetts on federal bank robbery charges. Sperrazza was a principal witness against Connor in that case. During his cross-examination by Connor's counsel, Sperrazza was asked about his involvement in the murder of Stokes. He claimed his right under the Fifth Amendment to the Constitution of the United States not to testify about such matters "on the ground it might incriminate me." **United States v. Connor**, C.R. 79-00432-z, Transcripts of June 2, 1980 at pp. 30-31. Sperrazza maintained this position throughout this trial and also claimed his right not to testify under the Fifth Amendment with respect to certain other alleged criminal activity not directly relevant here. On June 21, 1980, Connor was acquitted of the federal bank robbery charge brought against him. Sperrazza, on being informed of the verdict, told law enforcement officials that he thought his claiming the Fifth Amendment in the presence of the jury had impaired his credibility.

By this time - Summer, 1980 - Sperrazza had been accepted into the Federal Witness Protection Program and, at the conclusion of his testimony in the federal bank robbery case against Connor, was

removed to a Federal correctional facility outside Massachusetts.

The trial of Connor for his participation in the murders of Spinney and Webster was set for October 6, 1980 in the Superior Court for the County of Norfolk. Naturally, Special Assistant Attorney General Buckley, in preparing to prosecute that case, made plans to travel outside Massachusetts to meet personally with Sperrazza. Prior to any such meeting being arranged, however, Sperrazza had on more than one occasion called a special agent of the F.B.I. in Boston to say that he was interested in talking about the Stokes murder. On September 29, 1980 the Connor trial in the Norfolk Superior Court was continued indefinitely.[1] On October 6, 1980, as part of an out-of-state trip to prepare Sperrazza as a witness in the upcoming Connor trial, Sergeant Hudson and two F.B.I. agents met with Sperrazza. Everyone expected that Sperrazza wanted to talk about the Stokes murder since he had, on more than one occasion, earlier called the F.B.I. and expressed a willingness to disclose what he knew about that incident. Before any discussion of the Stokes matter was permitted, Sperrazza was again fully and carefully informed of his **Miranda** rights. After receiving such advice, Sperrazza informed the officers that he fully understood his rights and wanted to discuss the murder of John Stokes without his lawyer being present. He then signed a written statement which set forth the rights of which he had been advised, his understanding of them, his willingness to talk without a lawyer being present, and which concluded, "No promises were made to me. I have not been threatened or intimidated." Sperrazza said he wanted to "get everything out in the open" and didn't want to be embarrassed in the upcoming Connor trial. Sperrazza then made a statement in which he admitted murdering Stokes but insisted that Connor had masterminded this murder just as he had ordered the murders of Spinney and Webster. The reason for killing Stokes, according to Sperrazza, was that Stokes had been "talking to other inmates about the murders of Karen Spinney and Susan Webster, as well as his involvement and that of others in bank robberies, the theft of the Rembrandt painting and various breaking and enterings."

The trial of Connor for his participation in the murders of Spinney and Webster commenced on February 22, 1981 in the Superior Court for the County of Norfolk. Sperrazza was the principal witness against Connor and testified fully concerning the consideration that had been afforded him by state and federal authorities in return for his testimony. His testimony during this trial on these matters did not include any admission that he had been awarded immunity from prosecution for his part in the Stokes murder. Indeed, the Stokes murder was not the subject of cross-examination by Connor's defense counsel, apparently because of the concern that, if the matter were brought up, Sperrazza's story that Connor was the mastermind behind that murder would come out as well.

Sperrazza has subsequently been indicted for the murder of Stokes by the Grand Jury for the County of Norfolk and here seeks to dismiss that indictment or, in the alternative, to suppress the statement that he made to law enforcement officials on October 6, 1980.

---

1. This continuance, granted only eight days before the trial was to have begun and after a special venire had been summonsed to hear the case, occasioned significant expense to the Massachusetts taxpayer. It was, however, required since WCVB-TV, Channel 5, had, despite the request of a Judge of the Superior Court, aired a program entitled "Witnesses for Hire" within the viewing area from which the jury was to be drawn. This program featured Connor's defense counsel prominently and took the view that witnesses in Sperrazza's position were highly suspect. The airing of this program so shortly before the Connor trial was scheduled to begin has been the subject of much criticism. See the formal complaint lodged by Hon. P. Vincent R. Brogna, Justice of the Superior Court, with the Federal Communications Commission and the remarks of Anthony Lewis, Legal Reporter to the **New York Times,** made at the program of the Franklin Flashner Judicial Institute entitled "The Media: What Can Judges Expect From Them?", February 6, 1982.

Both parties agree that, in the plea-bargaining context, the courts must enforce a prosecutor's promise where the defendant has relied on that promise to his detriment. **Commonwealth v. Smith,** Mass. Adv. Sh. (1981) 2119, 2121-2123. **Commonwealth v. Spann,** Mass. Adv. Sh. (1981) 681. **Commonwealth v. Tirrel,** Mass. Adv. Sh. (1981) 334, 344. See, **Commonwealth v. Benton,** 356 Mass. 447, 448 (1969) (Wilkins, C.J.) citing **Commonwealth v. Knapp,** 10 Pick. 477, 491-492 ("when such promises are made by the public prosecutor or with his authority, the court will see that due regard is paid to them, and the public faith which has been pledged by him is duly kept.").

Sperrazza invokes that principle here, claiming that the letter agreement, so-called, encompasses disclosures concerning the Stokes murder, that he relied on that agreement when he made his inculpatory statement to the authorities, and that, therefore, the indictment must be dismissed. He is wrong on all three counts.

First, the letter agreement does not, either by its plain terms, or by fair implication, encompass the Stokes murder. The broadest reach of the language of the letter agreement is set forth in the following words: "...with regard to any statement that Mr. Sperrazza may make **relative to the above subject matter to any law enforcement agent from your office,** the parties agree and understand that his testimony will not in any way be used against him..." (emphasis supplied). The "above subject matter" is fully and carefully listed in the first portion of the letter in lawyer-like contractual terms. It would torture the plain language used to now read that language as encompassing the Stokes murder, a matter that was not even contemplated by either Mr. Beauchesne or Mr. Krasnoo at the time. Thus, if this bargain is in fact to be analogized to a contractual negotiation, **Commonwealth v. Smith,** Mass. Adv. Sh. (1981) 2119, 2121-2123; **Commonwealth v. Tirrell,** Mass. Adv. Sh. (1981) 334, 344; **Jones v. Estelle,** 584 F.2d 687 (1979), then the plain words of the contract simply do not reach the confession made here.

Failing to prevail on the written integration of the parties' intent, Sperrazza next argues that the letter agreement drafted by his attorney is ambiguous and ought be more broadly construed than the words used by his attorney will permit. He points out that "the test as to whether there was an enforceable promise is 'whether the defendant has reasonable grounds for assuming his interpretation of the bargain' (**Blaikie v. District Attorney for the Suffolk Dist.** [375 Mass. 613] 619 n.2) and whether he relied on that interpretation to his detriment." **Commonwealth v. Smith, supra.** at 2123. In this regard he can properly point out that the subject matter of the bargain was, during the period before the letter agreement had been drafted and sent, at least twice referred to by law enforcement authorities in very broad terms. Beauchesne had once said on October 29, 1979 that he wanted to know "everything you've ever done and who you did it with," and Sergeant Hudson, on that same day, asked for all information concerning Sperrazza's criminal involvement with Myles Connor. Both of these requests are certainly broad enough to encompass the Stokes murder. Then, too, there is Beauchesne's oral promise to Krasnoo not to use against Sperrazza "anything we get from him". Certainly this promise could be construed to be broad enough to cover the Stokes murder. The trouble with this argument is that it seems clear that neither Sperrazza nor his counsel so interpreted the bargain.

Perhaps the surest guide to interpreting an ambiguous contract is the conduct of the parties pursuant thereto. While this Court finds that the letter agreement was intended by both Beauchesne and Krasnoo to be a full and complete written integration of the bargain between Sperrazza and the Office of the District Attorney for the Suffolk District, and while it was to that letter agreement and not to some earlier oral expression that Mr. Buckley agreed on behalf of the Attorney

General, this Court does not rely upon the conclusion that would be compelled in the commercial context, **i.e.,** that the earlier oral negotiations were superseded and extinguished by a fully integrated written contract. Rather, it is clear to this Court that neither Sperrazza nor his counsel ever believed - at least at any time prior to Sperrazza's indictment for the Stokes murder - that this particular criminal activity was encompassed by any plea bargain agreement. Sperrazza carefully stood upon his Fifth Amendment rights in all legal proceedings prior to October 6, 1980 and thereafter, in disclosing all the consideration afforded him by state and federal authorities during the Connor trial in Norfolk County, he never once claimed that he had transactional or use immunity[2] from prosecution for the Stokes murder. Nor is this simply the result of confusion on his part as to the scope of the agreement. When the matter first came up, on May 13, 1980, he asked and was granted the opportunity to consult with the very attorney who had neglected and drafted the letter agreement. Immediately following such a conference, Sperrazza declined to discuss the Stokes murder - a reticence that is meaningless had he had the immunity he now claims and one which, if his present assertions as to the scope of the agreement were to be believed, violates his own duty to perform thereunder and testify truthfully as to everything he knew. This Court finds the reverse to be the case. While it appears that Sperrazza has faithfully carried out his agreement originally made with the Office of the District Attorney for the Suffolk District, and confirmed by the Attorney General, that agreement, written or oral, cannot be interpreted to reach the Stokes murder.

While these factual findings require that the motion to dismiss be denied, the matter cannot be said to be entirely free from doubt. It is therefore appropriate to articulate an alternative holding which confirms the conclusion here reached. Even if the plea bargain agreement had been broad enough to encompass the Stokes murder, neither the District Attorney for the Suffolk District nor the Attorney General has the power to grant Sperrazza transactional or use immunity with respect to statements he might make regarding the Stokes murder. "[T]he legislature has made it clear by certain legislative enactments that the prosecutor has no power to grant immunity...General Laws c. 233, secs. 20C-20I were enacted in 1970 and provide that immunity may be conferred on a witness before a grand jury only by order of a Justice of the Supreme Judicial Court. We agree with the reasoning of the Superior Court Judge here where he said, 'I rule the statutory plan preempts the subject and leaves no residual authority in the several District Attorneys...to grant immunity from prosecution.' " **Grand Jurors for Middlesex County for the Year 1974 v. Wallace,** 369 Mass. 876, 879 (1976). Since no attempt was ever made to grant statutory immunity to Sperrazza, this ought settle the point. Contrary to Sperrazza's suggestion, subsequent cases do not weaken the force of **Wallace.** In **Wallace,** the Court noted that, "we are not faced with here, and do not rule on, the issue of whether the trial judge has

---

2. In **Kastigar v. United States,** 406 U.S. 441, 441 (1972) the Supreme Court held that a witness could be compelled to speak without granting him complete immunity as long as he is granted "immunity from use of the compelled testimony...as well as immunity from use of evidence derived from the testimony." Some commentators have suggested that, under the compulsory process clause of the Sixth Amendment to the United States Constitution, the state may be compelled to give use immunity to defense witnesses. Weston, Compulsory Process, 74 Mich. L. Rev. 71, 166 (1974) Note, The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses, 91 Harv. L. Rev. 1266 (1978).

power to grant immunity apart from the procedure and provisions of the legislative enactments referred to." **Grand Jurors for Middlesex County for the Year 1974 v. Wallace, supra.** at 879 n.4. It is to this unresolved point that the later cases refer. The cases relied on by Sperrazza do not in any way stand for the proposition that the Supreme Judicial Court is re-thinking the views it expressed in **Wallace.** See, **Commonwealth v. Simpson,** 370 Mass. 119, 121 n.1 (1976) ("Recently, we noted the existence of this unresolved question [**i.e.,** whether G.L.c. 233, sec. 20F, establishes the exclusive procedure by which a Superior Court Judge may grant immunity to a witness on request of a District Attorney] but were not called on to answer it. **Grand Jurors for Middlesex County for the Year 1974 v. Wallace,** 369 Mass. 876, 879 n.4 [1976]"); **Commonwealth v. Michel,** Mass. Adv. Sh. (1980) 2011, 2014 ("We leave open the question whether G.L.c. 233, sec. 20C **et seq.,** is the exclusive procedure by which a witness may be granted immunity. See, **Commonwealth v. Simpson,** 370 Mass. 119, 121 & n.1 [1976]"). In short, since the Wallace decision in 1976 it has been clear that District Attorneys have no power outside the express terms of the statute to grant immunity, Superior Court Judges may have such a power, and Justices of the Supreme Court certainly have such power if anyone does. The statutory scheme is clear as are the controlling decisions. Accordingly, even if the plea bargain agreement were to be interpreted as broadly as Sperrazza requests, he could form no reasonable reliance thereon in light of the clearly controlling law, a matter which this Court infers his counsel explained to him on March 13, 1980, if not before.

But what, counters Sperrazza, of the language in **Commonwealth v. Michel, supra.** at 2014 n. 4, "If the statement is viewed as a promise, the Commonwealth is bound to keep its word. **Commonwealth v. Benton,** 356 Mass. 447 (1969)" and the opinion in **Commonwealth v. Smith,** Mass. Adv. Sh.

(1981) 2119, 2122 that "We would go beyond contract principles to order specific performance of prosecutor's promise even where no contract may have existed, if, on principles of fundamental fairness encompassed within notions of due process of law, the promise should be enforced." This Court concludes that the language just quoted requires no more than that a prosecutor who makes a promise to a defendant shall be required to keep it even if the result is to order the entry of a **nolle prosequi** in an action under his jurisdiction. This Court does not conclude that a broad promise of immunity made by one District Attorney binds all others throughout the Commonwealth.[3] At most, it binds only his own office and his successors. To hold otherwise would be to set at naught - at least in the area of criminal plea bargaining - the longstanding rule that "the right of the public to have the...laws properly administered cannot be forfeited by the action of its officials." **New City Hotel Co. v. Alcoholic Beverages Control Comm'n,** 347 Mass. 539, 542 (1964) (Spalding, J.). **Ferante v. Board of Appeals of Northhampton,** 345 Mass. 158.

---

3. A contrary holding could make law enforcement chaotic in the extreme. Prosecutors have extremely broad powers. "[A]s the powers of other criminal justice officials have contracted, those of prosecutors have expanded. The fate of most of those accused of crime is determined by prosecutors, but typically this determination takes place out of public view--in the hallways of the courthouse, in the prosecutors' offices; or on the telephone. There is a broad and rather casual acceptance of the fact that prosecutors often exercise greater control over the administration of criminal justice than do other officials." Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1522 (1981). Prosecutors ought not be permitted to give an "immunity bath", see, **In re Kilgo,** 484 F2d 1215, 1222 (4th Cir. 1973), outside the scope of action authorized by the statute. Indeed, adoption of the contrary rule in the present circumstances - where, in utmost good faith but at direct cross purposes the Office of the District Attorney for the Norfolk District was apparently using Connor to implicate Sperrazza while the Office of the District Attorney for the Suffolk District was dealing with Sperrazza to get Connor - might result in a situation where neither could be convicted.

162-163 (1963). Nor is it unfair to a defendant to apply to this area the common rule that estoppel will not operate against the Commonwealth. As will be seen below, his rights are fully secured by the Commonwealth's human practice of requiring a preliminary determination that, before a defendant's confession or admission may be used against him, such statements must be voluntary. In this case, although it is a close question concerning whether Sperrazza's October 6, 1980 statement was voluntary, this Court has no doubt that Sperraza made the statement without any reliance on either the letter agreement, so-called, or any oral assurances of Assistant District Attorney Beauchesne. In fact, the Court infers that he was expressly advised by his counsel that the plea bargain agreement did not cover the Stokes murder and very well knew that to be the case.

Accordingly, both because as a factual matter, the plea bargain agreement cannot be now interpreted as Sperrazza would have it, and, in any event, he never relied on any such agreement in making his inculpatory statement, and, alternatively, because even were the plea bargain agreement as broad as Sperrazza would now have the Court believe, the District Attorney for the Suffolk District has no power, outside the applicable statute, to grant either transactional or use immunity and any such promise cannot be reasonably relied upon and enforced against the District Attorney for the Norfolk District to the extent of requiring him to **nol pros** a matter within his jurisdiction,[4] the motion to dismiss must be denied.

While the motion to dismiss must be denied, there remains for analysis the motion to suppress the inculpatory statements made on October 6, 1980. This motion presents a much closer question.

The first aspect - whether Sperrazza knowingly, intelligently, and voluntarily waived his right to remain silent after **Miranda** warnings is not too difficult. This Court finds that he did. At all material times, Sperrazza appears to have intelligently and knowingly understood what he was about. This Court finds that he was given the full panoply of **Miranda** warnings before the October 6, 1980 statement, that he fully understood the import of those warnings, and knowingly and intelligently waived his right to remain silent. Moreover, his conduct was "voluntary" in the sense that it was a rational calculus of his best advantage given the circumstances in which he found himself. This Court therefore rules that the Commonwealth has met its burden of proving by a fair preponderance of the evidence that Sperrazza's statement was voluntary. **Lego v. Twomey,** 404 U.S. 477, 489 (1972).[5]

4. Of course, even under this reasoning a promise made on behalf of the Attorney General might be specifically enforced by requiring him to take charge of a case and then **nol pros** it. No such result is mandated here, however, since Special District Attorney General Buckley promised only to adhere to the letter agreement, so-called, and was neither a party to nor did he adopt the earlier, broader statements made by Beauchesne and Hudson. This Court has already held that the letter agreement cannot be read to reach the Stokes murder.

5. In **Lego v. Twomey,** the Supreme Court held that, during the constitutionally-mandated **voir dire** concerning the voluntariness of a confession, the Commonwealth must prove voluntariness by a preponderance of the evidence. The Court noted that the states are free to require an higher standard of proof should they wish. In **Commonwealth v. Roy,** 2 Mass. App. Ct. 14 (1974), the Appeals Court stated that the preponderance standard applied to the waiver of **Miranda** rights determination, but in **Commonwealth v. Hooks,** 375 Mass. 284, 288 n. 1 (1978), the Supreme Judicial Court stated, "the question has remained open whether this burden [**Miranda** waiver] may be met if the preponderance of the evidence standard is satisfied, or whether a more exacting standard, such as beyond a reasonable doubt, is applicable to the demonstration of a valid waiver..." The question is still open. **Commonwealth v. Williams,** 378 Mass. 217, 225 n. 5 (1979); **Commonwealth v. Jackson,** 377 Mass. 319, 329 (1979).

However, "a judge's finding that a defendant knowingly and voluntarily waived his **Miranda** rights is not the only prerequisite to admissibility. A judicial determination of voluntariness is also constitutionally required. **Jackson v. Denno,** 378 U.S. 368 (1964)...'[A]n incriminating statement may also be inadmissible and insubmissible because not factually shown to have been freely and voluntarily given, even though the requirements of **Miranda** have been fully met.' **Coyote v. United States,** 380 F.2d 305, 309-310 (10 Cir.) **cert. denied,** 389 U.S. 992 (1967). See, **Eisen v. Picard,** 452 F.2d 860, 863-865 (1st Cir. 1971)." **Commonwealth v. Tavares,** 385 Mass. 140, 145 (1982). Moreover, on this aspect of voluntariness the Commonwealth's burden is proof beyond a reasonable doubt and this Court must make a preliminary determination that the evidence warrants such a conclusion of voluntariness by a jury. **Commonwealth v. Garcia,** Mass. Adv. Sh. (1980) 21, 41-42 (1980).

This is the most difficult determination presented by these two motions. Sperrazza was, on October 6, 1980, in a continuing custodial setting in some federal correctional facility. He was then serving three life sentences, two of them consecutive, as well as other substantial sentences. It may be inferred that Sperrazza's cooperation with law enforcement authorities makes him a target of animosity both by inmates within the Massachusetts correctional system and elsewhere-hence his admission into the elaborate Federal Witness Protection Program. Moreover, it is readily inferable that Sperrazza continued to be concerned that his wife and mother-in-law might also be subject to harm since they too were beneficiaries of government largesse pursuant to the Federal Witness Protection Program. His fears on their behalf could not have been allayed by the fact that Ralph Petrozziello, an individual inculpated by Sperrazza's

testimony and cooperation, remains at large. Finally, this Court infers that Sperrazza was concerned that his usefulness to law enforcement authorities would wane if he again claimed his Fifth Amendment right with respect to the Stokes murder since the jury in the federal bank robbery case against Connor appeared to have disbelieved his testimony after he claimed the Fifth Amendment at that time. In short, the amenities of Sperrazza's daily life, the safety of his wife, mother-in-law, and himself, indeed, virtually every aspect of his existence had, by October 6, 1980, been surrendered to law enforcement officials. In such circumstances, it is most difficult to conclude that Sperrazza voluntarily disclosed his part in the Stokes murder as an act of conscience or following the dictates of a free and unfettered mind. This Court concludes that, as a matter of law, the Commonwealth could not so prove beyond a reasonable doubt.

Nevertheless, two distinct circumstances of the present case convince the Court that a jury would be warranted in finding Sperrazza's October 6, 1980 statement "voluntary" beyond a reasonable doubt, at least as an intelligent and rational calculus of his prospective advantages. These circumstances are first, that it was Sperrazza and not law enforcement officials who initiated any discussion of the Stokes murder; and second, that there is not the slightest hint in the record before this Court that law enforcement officials gave, withheld, or conditioned any advantage or detriment whatsoever upon discussion of the Stokes murder. Compare **Commonwealth v. Brant,** Mass. Adv. Sh. (1980) 135. Had there been the most subtle pressure, however slight, on Sperrazza to discuss the Stokes murder; indeed, had law enforcement agents in any way initiated a discussion, this Court concludes that the resulting statement would, given the totality of the circumstances of Sperrazza's incarceration,

have required that the statement he made be suppressed.[6] In the present case, however, Sperrazza's situation is entirely the result of his own criminal activity and the solemn imposition upon him of sentences for the most heinous of crimes. The particular attributes of his present incarceration were specifically bargained for by him. Law enforcement officials had scrupulously avoided any discussion of the Stokes murder until Sperrazza himself brought it up and indicated, on more than one occasion, that he wished to discuss the matter. In these unique circumstances, this Court finds that Sperrazza acted out of a desire to demonstrate his full cooperation with law enforcement officials, that he was not relying on any promise of immunity for the Stokes murder - and indeed, had been advised by his counsel that the bargain did not encompass that murder, and that, given the present array of sentences imposed upon him, even the risk of prosecution for the murder of Stokes caused little concern in light of the advantages he perceived from demonstrably complete cooperation with the authorities. In this sense then, as a rational calculus of what he perceived to be to his advantage - and nothing more - the statement of October 6, 1980 may be said by a jury to be "voluntary beyond a reasonable doubt." Accordingly, the motion to suppress must also be denied.

By the Court,

**William G. Young**

**Justice of the Superior Court**

---

6. The Court recognizes that such a strict injunction against the use of an incarcerated but "protected" witness will rapidly render him valueless to law enforcement officials once the original bargain has been struck and implemented. Since what such witnesses say about other matters can hardly be considered voluntary save in the unique circumstances presented here, such officials may find that, in order to insure the continued cooperation of such witnesses, statutory immunity will have to be secured.

Though the results may warrant it, it is difficult to over-estimate the dangers inherent in using an incarcerated but "protected" witness. For example, should Connor convince some court that the deal with Sperrazza encompassed the Stokes murder, Sperrazza's failure to disclose it during the course of his cross-examination in the trial of Connor would require that his conviction be set aside. **United States v. Agurs,** 427 U.S. 97 (1976). Note, A Prosecutor's Duty to Disclose Promises of Favorable Treatment Made to Witness for the Prosecution, 94 Harv. L. Rev. 887 (1981).